Milo Steven Marsden (Utah State Bar No. 4879)
Peggy Hunt (Utah State Bar No. 6060)
Nathan S. Seim (Utah State Bar No. 12654)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email:  hunt.peggy@dorsey.com
       marsden.steve@dorsey.com
       seim.nathan@dorsey.com

*Attorneys for Plaintiff D. Ray Strong, Liquidating Trustee*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| D. RAY STRONG, as Liquidating Trustee of the Consolidated Legacy Debtors Liquidating Trust and the Castle Arch Opportunity Partners I, LLC Liquidating Trust,<br><br>     Plaintiff,<br><br>v.<br><br>ROBERT D. GERINGER; ROBERT D. GERINGER, P.C.; and FINE ARTS ENTERTAINMENT, INC.,<br><br>    Defendants. | COMPLAINT<br>(Related to Case No. 2:14-cv-00788-TC)<br><br><br>Case No.  2:15-cv-00837-BSJ<br><br>Judge:  Bruce S. Jenkins<br><br><br>Demand for Jury |

Plaintiff D. Ray Strong (the "Trustee"), as the (i) post-confirmation estate representative

of Castle Arch Real Estate Investment Company, LLC ("CAREIC"), CAOP Managers, LLC

("CAOP Managers"), Castle Arch Kingman, LLC ("CAK"), Castle Arch Smyrna, LLC ("CAS"),

Castle Arch Secured Development Fund, LLC ("CASDF"), Castle Arch Star Valley, LLC

("CASV") and Castle Arch Opportunity Partners I, LLC ("CAOP I") (collectively, the

"Debtors"), and (ii) Liquidating Trustee of the Consolidated Legacy Debtors Liquidating Trust

and the Castle Arch Opportunity Partners I, LLC Liquidating Trust (together, the "Trusts"), as

appointed in such capacities in the bankruptcy case styled as *In re Castle Arch Real Estate Investment Company, LLC et al.*, Case No. 11-35082 (the "<u>Bankruptcy Case</u>"), filed in the United States Bankruptcy Court for the District of Utah (the "<u>Bankruptcy Court</u>"), alleges and avers as follows:

## I.   <u>NATURE OF THE CASE</u>

1.      This is a case brought by the Trustee on behalf of the Debtors and Trusts against Robert Geringer ("<u>Geringer</u>") and his entities to recover the tens of millions of dollars that the Debtors' investors and creditors lost because of Geringer's unlawful and fraudulent conduct and operation of the Debtors.

2.      Prior to filing their Chapter 11 bankruptcy petitions in October 2011, the Debtors had raised approximately $70 million from investors.  Geringer and the other members of CAREIC's management (collectively, "<u>Management</u>"), told investors this money would be used to prudently acquire, entitle and develop real estate.  This was not true.

3.      Indeed, Geringer—the President of CAREIC and the person in charge of the Debtors' real estate operations—recklessly moved forward with accelerated investment in raw land long after it was clear that the real estate market was collapsing, and most national production home builders had drastically curtailed, or entirely stopped land purchases.  For instance, by October 25, 2006, Pulte Homes (a national home builder) had announced that "the U.S. housing market was impacted by lack of consumer confidence, decreased housing affordability, and large supplies of resale and new home inventories and related pricing pressures."  As a result, Pulte said, it was "adjust[ing its] approach to land acquisition and construction practices, *continuing to shorten our land pipeline*, *reduce production volumes*,

and balance home price and profitability with sales pace. We are slowing down planned land

purchases and reducing our total number of controlled lots owned and under option."

4.     Similarly, on September 6, 2006, KB Homes (another national home builder)

announced that it had experienced "an increasingly challenging housing market . . . [and] the

supply of new and resale home inventories has built up in recent months. . . ."  Further, KB

Homes said that "further intensifying the unfavorable conditions in the housing market is the

weaker than expected demand for new homes."  As a result, KB said it was taking action to

reduce overhead, curtail land acquisitions, and "monetize non-strategic land positions."

5.     Notwithstanding these conditions, Geringer continued to close substantial land

purchases in, among other places, Kingman, Arizona and Smyrna, Tennessee.  Not

surprisingly, by the time the Debtors were forced to file bankruptcy, Geringer and the Debtors

had entirely failed to successfully entitle, develop, or sell – with the exception of one small

parcel in Star Valley, Wyoming – the real property acquired.

6.     Despite his failure to successfully complete any real estate project for the

Debtors, Geringer was paid handsomely throughout the course of the Debtors' existence.

Geringer brought no value to the Debtors, and was paid essentially for wasting investors'

money on projects that he knew, or should have known, were either completely infeasible or so

high risk that a prudent real estate developer would never have pursued them.  Indeed, over the

course of its existence, CAREIC generated almost no revenues from operations.  Rather, it

funded almost exclusively by money raised from investors.

7.     Investor funds were primarily raised through private placement memoranda

("PPMs") and other marketing materials.  These materials did not disclose the true facts about

the Debtors' operations and financial results.  Nor did they adequately disclose the actual

characteristics and risks of the real estate "projects" in which investors were solicited to invest.

8.     On information and belief, other numerous material misrepresentations and

omissions occurred in face-to-face investor solicitation meetings.

9.     Additionally, Geringer caused, or failed to stop, the Debtors from selling

securities illegally through unlicensed brokers-dealers.

10.     To facilitate fundraising efforts, Geringer and Management caused several

"investment-specific" entities to be created.  Geringer and Management represented to

investors through PPMs or otherwise that their investment in one of these investment-specific

entities would be used to fund the project that entity had ostensibly been formed to pursue.  In

fact, Management co-mingled investment funds from all entities and treated these investment-

specific entities as their private piggy banks, whose funds could be used at the whim of

Management.

11.     In short, while Geringer and Management controlled the Debtors, they raised

money by defrauding investors, they operated the Debtors in a way that consistently breached

their fiduciary duties of care, loyalty, and disclosure, and they failed to comply with basic

standards for operating, managing and monitoring the real estate development projects in

which they were engaged.

## II.     PRIOR BANKRUPTCY PROCEEDINGS

12.     On October 17, 2011, a Receiver appointed by a Utah State Court filed a

voluntary Chapter 11 bankruptcy petition for CAREIC in the Bankruptcy Court,[1] and on

---

[1] Bankr. Case No. 11-35082.

October 20, 2011, the Receiver also filed Chapter 11 petitions for each of the other Debtors,[2] other than CASV (collectively, these dates are referred to as the "Petition Date").

13.    On May 3, 2012, the Bankruptcy Court entered an Order appointing the Trustee as the Chapter 11 Trustee for CAREIC,[3] and in that capacity, the Trustee managed, either directly or indirectly, each of the other Debtors.

14.    On February 8, 2013, the Bankruptcy Court entered an Order substantively consolidating all of the Debtors, other than CAOP I, with CAREIC (the "Consolidation Order").[4]  The consolidated entities of CAREIC, CAOP Managers, CAS, CAK, CASDF and CASV are referred collectively herein as the "Legacy Debtors."

15.    In conjunction with the Consolidation Order, the Bankruptcy Court entered detailed *Findings of Fact and Conclusions of Law*, a copy of which is attached hereto as **Exhibit 1** (the "Consolidation Findings and Conclusions"),[5] finding and concluding as follows:

   a.   The Legacy Debtors were all managed by CAREIC's single management team on a consolidated basis, and they had no corporate existence outside of the CAREIC corporate family.[6]

   b.   Bank accounts opened for the Legacy Debtors were controlled by CAREIC's management team.[7]

---

[2] Bankr. Case Nos. 11-35237 (CAOP Managers), 11-35242 (CAK), 11-35243 (CASDF), 11-35246 (CAS), and 11-35240 (CAOP I).  These bankruptcy cases are being jointly administered or are substantively consolidated with CAREIC's bankruptcy case in Case No. 11-35082.

[3] Bankruptcy Case Docket No. 215 (Order of Appointment).

[4] *Id.* at Docket No. 590.

[5] *Id.* at Docket No. 591.

[6] *See* Exh. 1 (Consolidation Findings and Conclusions, ¶¶ 17-32, & ¶ 107(c) – (f)).

[7] *Id.* ¶ 25 *see also id.* ¶¶ 47- 59 (discussing bank accounts and intermingling of cash).

c. The primary source of the Debtors' cash was not operations, but cash raised from investors through a series of public offerings.[8]

d. The raising of cash fit a pattern—as cash was consumed and additional cash was needed, Management caused new securities offerings to be made, initially through CAREIC, and later through the other Debtors.[9]  Thus, the formation of the Debtors was "a vehicle by which to obtain additional investor funds[.]"[10]

e. Cash raised from investors of each of the Legacy Debtors was "used indiscriminately by the Debtors to fund whatever entity was in need of cash at any given time."[11]  Cash was used "as if part of one big 'piggy bank,' with funds from the account of whichever entity had cash on deposit being transferred, commingled, and used by the entity in need of cash at any given time."[12]

f. The Legacy Debtors' "assets and affairs are hopelessly commingled [and] it was not uncommon for funds obtained from investors in one of the Legacy Debtors to be deposited into a bank account of another one of the Legacy Debtors[.]"[13]  Furthermore, "it was not uncommon for one Legacy Debtor's cash to be used to directly pay the expenses of another Legacy Debtor."[14]  Finally, "in addition to significant commingling and intercompany transfers of cash . . . assets were purchased as part of very convoluted intercompany transactions.[15]

g. "A large portion of the Legacy Debtors' business focused on fundraising[,]"[16] with approximately 25% of all investor funds being used for executive compensation and fundraising expenses, such as finders' fees and commissions.[17]

---

[8] *See id.* ¶¶ 33-34 ("With the exception of relatively limited revenues from the sale of certain property holdings, neither CAREIC nor any of the Legacy Debtors had any operating revenue."), ¶ 46 (Legacy Debtors "had relatively little revenues generated from operations, but rather operating costs . . .  were funded by monies raised from the sale of securities to investors."), & Consolidation Findings and Conclusions Exh B (Timeline of Castle Arch Entity Formations and Investment Offerings).

[9] *Id.* ¶ 35; *see id* ¶¶ 36-39 (providing detail of this pattern), ¶ 107(d), & Consolidation Findings and Conclusions, Bankruptcy Docket No. 591,  Exhs. E-G (showing use of cash and public offerings).

[10] *Id.* ¶ 107(d).

[11] *Id.* ¶ 25; *see also id.* ¶¶ 46-59 & ¶107(b).

[12] *Id.* ¶ 58.

[13] *Id.* ¶ 50.

[14] *Id.* ¶ 53.

[15] *Id.* ¶ 61; *see id.* ¶¶ 64-91 (providing examples).

[16] *Id.* ¶ 41; *see id.* ¶¶40-45.

     h.   Almost all of the real properties that the Legacy Debtors purchased and owned as of the filing of the Bankruptcy Cases remained undeveloped, with no entitlements in place.[18]

16.     On June 7, 2013, the Bankruptcy Court entered an *Order Confirming Chapter 11 Trustee's First Amended Plan of Liquidation Dated February 25, 2013 as Modified* (the "Confirmation Order")[19] which, among other things: (i) confirmed the *Second Amended Chapter 11 Trustee's Plan of Liquidation Dated February 25, 2013* (the "Confirmed Plan")[20]; (ii) approved the Liquidating Trust Agreements for each of the Trusts; (iii) appointed the Trustee as the post-confirmation estate representative for each of the Debtors; and (iv) appointed the Trustee as the Liquidating Trustee for the Trusts.

17.     Pursuant to the Confirmed Plan and the Liquidating Trust Agreements: (i) the assets of the Legacy Debtors and CAOP I were transferred to the respective Trusts, including all "Claims" and "Causes of Action" (as defined in Section 1.1 of the Confirmed Plan), as well as all "Individual Claims" (i.e., individual claims of investors as defined in Section 6.4 of the Confirmed Plan).

18.     Through this Complaint, the Trustee, as the Liquidating Trustee of the Trusts, brings the Debtors' Claims and Causes of Action against Defendants, as well as the Individual Claims of investors, to assist in making a return to the Debtors' creditors and investors.

---

[17] *Id.* ¶ 42.

[18] *Id.* ¶ 45.

[19] Bankruptcy Case Docket No. 705.

[20] *Id* at Docket No. 701.

### III.    JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction of this proceeding pursuant to 28 U.S.C. §§ 1331 and 1334(b) because this Complaint states claims on behalf of the Liquidating Trusts arising under Title 11 of the United States Code, and this civil proceeding is a proceeding arising under Title 11, or arising in or related to the Debtors' Bankruptcy Case.

20.    Geringer, directly and indirectly, singly and in concert, has made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails in connection with the transactions, acts, and courses of business alleged herein, certain of which have occurred within the District of Utah.

21.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1409(a) because: (a) certain of the transactions, acts, practices and courses of business alleged in this Complaint took place in the District of Utah; and (b) the Debtors' Bankruptcy Case is pending in the Bankruptcy Court for the District of Utah, and this is a proceeding arising under Title 11, or arising in or related to the Debtors' Bankruptcy Case under Title 11.

### IV.    PARTIES

22.    Plaintiff is the estate representative for the Debtors and the Liquidating Trustee for the Trusts.  Pursuant to this Complaint, the Trustee is bringing: (a) the Debtors' Claims and Causes of Action against Defendants; and (b) the Individual Claims and Causes of Action of the Debtors' investors against Defendants.

23.    Defendant Geringer is a resident of the State of California.  Geringer served as CAREIC's President and was a member of CAREIC's Board of Directors from its inception in

2004 until he resigned in July 2009.  Under CAREIC's Amended Operating Agreement, Geringer—as President—had "general charge of the business, affairs, and property of the Company and general supervision over its officers, employees, and agents."  Additionally, and as concluded by the Bankruptcy Court, "[b]ecause Geringer was the only one with real estate experience, and at Geringer's own request, Cochran [CAREIC's CEO] granted Geringer 'the authority to bind the corporation with regard to any contracts, liabilities, obligations or other matters relating to the operation of Castle Arch or with regard to the acquisition, disposition or encumbrance of any properties.'"[21]

24.     Upon information and belief, Robert D. Geringer, P.C. is a California corporation that is solely owned and managed by Geringer, and which received funds from the Debtors.

25.     Upon information and belief, Fine Arts Entertainment, Inc. is a California corporation that is solely owned and managed by Geringer, and which received funds from the Debtors.

## V.     GENERAL ALLEGATIONS

### A.     The Debtors' Corporate and Capital Structure

26.     On or about April 1, 2004, Geringer and three other parties formed CAREIC.

27.     In addition, during CAREIC's existence, Geringer and Management formed several other entities (*e.g.*, CAS, CAK and CASDF), claiming that these entities were created to develop specific projects or to exploit specific investment opportunities.

28.     Over the course of CAREIC's existence, Management raised approximately $70 million from investors to fund the operations of CARIEC or the other Debtors.

---

[21] *Id.* at Docket No. 665 (Memorandum Decision) at p. 3.

29.     At all times, CAREIC owned all or substantially all of the membership interests of each of these entities, and CAREIC and the Debtors were fully, completely and exclusively controlled by Geringer and Management.

**B.     Geringer's Breaches of Fiduciary Duty.**

30.     Geringer had fiduciary duties to all of the Debtors and their shareholders as a result of his position as President, director, and agent of CAREIC and the Debtors.

31.     These duties required Geringer to use an appropriate standard of care, skill and diligence in his work for CAREIC and the other Debtors, to remain loyal to the Debtors, to prefer the interests of the Debtors over his own, and to fully and accurately disclose material facts to investors.  During his tenure with CAREIC and the Debtors, Geringer breached his fiduciary duties.

32.     As a result, despite raising approximately $70 million from investors, Geringer and Management did not – with the exception of one small parcel in Star Valley, Wyoming – complete entitlement of any of the Debtors' real estate projects, and Geringer and Management did not sell any substantial part of any of the Debtors' real estate projects.

**1.     Breaches of Fiduciary Duties Relating to Specific Real Estate Projects**

33.     Geringer breached his fiduciary duties of care, loyalty and disclosure in regards to the Debtors' real estate operations in Kingman, Arizona; Tooele, Utah; and Smyrna, Tennessee.

*(a)     Kingman Project*

34.     Geringer breached his fiduciary duties with respect to the real estate project in Kingman, Arizona by, among other things: (a) using irrational sales assumptions and pro forma

metrics that contradicted known data, and failing to disclose to investors accurate forecasts; (b) wasting corporate assets (investor money) on an infeasible project without sufficient funding and resources; and (c) engaging in co-mingled and self-dealing transactions that were not disclosed to investors.

35.     By contract dated August 31, 2005, Geringer secured purchase rights to several thousand acres of raw land in Kingman, Arizona for the purpose of developing a 2,100 acre master planned community with up to two 18-hole golf courses (the "Kingman Project").

36.     Geringer caused the closing of various parcels of raw land comprising the Kingman Project as follows:

| Date | Acres | Price |
|------|-------|-------|
| January 13, 2006 | 216 | $5,625,000 |
| February 2, 2006 | 21 | 454,405 |
| April 26, 2006 | 216 | 5,625,000 |
| March 9, 2007 | 40 | 1,100,000 |
| March 27, 2008 | 380 | $1,600,108 in cash and $8,257,371.00 in debt |

37.     In conjunction with these land purchases, Geringer caused the Debtors to pay $202,000 to purchase mineral rights, and another $500,000 to Nicklaus Design, LLC relating to potential golf courses.

1.     *Irrational and Unsupported Pro Forma Assumptions in CAK PPM*

38.     In May of 2006 – after spending nearly $13 million on the Kingman Project – Management issued the CAK Series A Private Placement Memorandum (the "CAK PPM"), pursuant to which approximately $10 million was raised from investors.

39.     Included in the CAK PPM was a pro forma model given to investors showing Management's underwriting and projections for the Kingman Project (the "Kingman Pro Forma").  Management's determination that investor funds should be spent on the Kingman Project was based on, among other things, the following assumptions: (a) a straight line 5% sales price escalator throughout the life of the Kingman Project; and (b) an absorption sales rate of approximately 992 finished lots per year.

40.     The straight line 5% sales inflation figure was irrational and optimistically high for the Kingman Project, which figure unrealistically inflated sales figures, expected profits and return on investment.

41.     Moreover, at the time of issuing the Kingman Pro Forma to investors, Geringer knew, or should have known, that the projected absorption sales rate was unrealistic.  Indeed, in the five years prior to the CAK PPM, the average number of new single family home permits issued by the City of Kingman was 451 per year – less than half of the 992 projected by the Kingman Pro Forma.

42.     In other words, to reach the projections of Geringer and Management, Kingman City's new home demand had to rise more than 100% (from 451 permits per year to 992 permits per year), and CAREIC had to capture 100% of that increase in new home demand.

43.     Geringer also received market studies from hired professionals showing that the sales absorption assumptions were illogical and not based on sound data, but Geringer ignored such studies and failed to disclose the existence of the studies to investors.

44.     Geringer had a fiduciary duty to use proper and accurate assumptions and forecasts in pursuing the Kingman Pro Forma.

45.     Geringer also had a fiduciary duty to disclose to investors: (a) accurate projections relating to the Kingman Project; (b) the existence of sound reports contradicting the Kingman Pro Forma; and (c) updated and revised projections relating to the Kingman Project as the project deteriorated.

46.     By not taking these actions, Geringer breached his fiduciary duties of care, loyalty and disclosure.

2.     *Wasting Corporate Assets on an Infeasible Project*

47.     The CAK PPM, which sought to raise $30 million for the Kingman Project, stated that the "project can be self-sustaining with the initial $30 million in equity and $15 million in debt financing in year two."

48.     Management, however, was only successful in raising approximately $10 million from investors – only one-third of the amount needed to sustain the Kingman Project.

49.     Notwithstanding the insufficient funding for the Kingman Project, Geringer continued to sink money into the project doomed to fail.  For instance, in March 2008 – after the unsuccessful CAK Series A offering – Geringer spent an additional $1.1 million of investor cash for 40 acres of raw land.  Then, again in March 2008, Geringer spent $1.6 million and committed the debtors to an additional $8.2 million in seller-financed debt to acquire another 380 acres of raw desert.

50.     Presumably to assist in funding the land purchase "after the fact," Management issued its Series B PPM in September 2008, which sought investor money in the amount of $15 million.  Only $50,000 was raised in that offering.  Even if the offering had been successful, CAREIC still would have been $20 million short of the amount needed to sustain the project.

51.     In short, Geringer caused the Debtors to spend cash, or incur debt, of about $23 million on a project that was doomed from the start due to insufficient funding and resources.

52.     Geringer had a fiduciary duty to ensure that the Debtors had sufficient funds and resources to take on a project as large as the Kingman Project before committing millions of dollars of investor capital into land purchases and development.

53.     By the end of the May 2006 CAK Series A offering, Geringer knew, or should have known, that the Debtors would not be able to raise the necessary $30 million from investors necessary to sustain the Kingman Project.

54.     Notwithstanding this fact, Geringer continued to sink millions of dollars into the large Kingman Project, and committed the Debtors to millions of dollars of additional debt, with no legitimate hope of the project being successful.

55.     Geringer also failed to inform investors of, and update projections based on, the lack of funding necessary to develop the Kingman Project.  Because of this, Geringer breached his fiduciary duties of care, loyalty and disclosure.

3.     _Engaging in Co-Mingled, Undisclosed, and Self-Dealing Transactions_

56.     Between March 2008 and May 2009, Management caused CAK to enter into three separate promissory notes in favor of CASDF, purportedly secured by various tracts of land comprising the Kingman Property.

57.     The asserted purpose of the three notes was to allow CAK to obtain funds from CASDF to assist with the Kingman Project.

58.     In reality, however, Management did not use the "loaned funds" from CASDF for the Kingman Project.  Instead, Management used the funds for, among other purposes,

CAREIC's general operations and obligations, as well as repayment of loans that Geringer and another member of Management made relating to CAS.

59.     Geringer had a fiduciary duty not to encumber, or not to allow the encumbrance of, the Kingman Project with liens and debt that did not directly benefit the project.  At a minimum, Geringer had a duty to disclose the unrelated debt to investors, and to update the Kingman Pro Forma to account for the additional debt.  Because this was not done, Geringer breached his fiduciary duties of care, loyalty and disclosure to investors.

### *(b)     Tooele Property*

60.     Geringer also breached his fiduciary duties with respect to the real estate project in Tooele, Utah by, among other things: (a) failing to disclose known annexation issues to investors; (b) wasting corporate assets (investor money) to purchase land and water rights despite actual knowledge of annexation limitations that made the project infeasible; (c) using irrational sales assumptions and pro forma metrics that contradicted known data, and failing to disclose to investors accurate forecasts; and (d) encumbering the project with millions of dollars of debt that solely benefitted a different project and entity, and failing to disclose the unrelated project debt to investors.

### 1.     *Carelessly Proceeding with Project Despite Insurmountable and Known Annexation Issues*

61.     As early as June 2005, Geringer knew that it was highly unlikely that he would be able to successfully annex the proposed real estate project into Tooele City.  In particular, Geringer knew that: (a) there would be multiple hurdles for *any annexation* into Tooele City; (b) only lands west of Canyon Road were in Tooele City's 5–10 year annexation plan at that time; (c) lands east of Canyon Road were not even identified as part of Tooele City's

annexation plan; and (d) the city was adverse to annexing any additional land due to a large amount of existing undeveloped land within the city's boundaries.

62.     Geringer had been informed that annexation was highly unlikely by Tooele City staff, professional planning and design services firms, other people knowledgeable about the Tooele area, and the Tooele City Council.

63.     Indeed, by October of 2005, Geringer knew that the very parcels he would seek to annex had been overwhelmingly turned down only 5 or 6 years before because of limited planning and no benefit to the City.

64.     By this time, Geringer also knew that in the absence of annexation, the density of the proposed real estate project would be limited to one lot per every 5 acres which, upon information and belief, would make the project completely economically infeasible.

65.     Despite this knowledge, on September 1, 2005 and October 27, 2005, Geringer closed on the purchase of about 264 acres of real property in Tooele, Utah (the "264 Acres") for approximately $7.2 million.

66.     In addition, in October 2005, Geringer closed on the purchase of about 449 acre-feet of water to be used in connection with the development (the "449 Acre Water").

67.     Management closed on the purchase of an additional 76 acres of real property in June of 2006 (the "76 Acres"), and in July 2006, Geringer closed on the purchase of an additional 7 acres of real property in Tooele (the "7 Acres" and, collectively with the 264 Acres and the 76 Acres, the "Tooele Property").

68.     Within one month thereafter, Geringer *admitted* to CAREIC's legal counsel that he knew Tooele City would not annex CAREIC's project into the City.  Notwithstanding this,

Geringer continued to spend money to acquire real estate and water in the Tooele area.  For instance, in November 2008, Geringer closed on the purchase of an additional 167 acre-feet of water for the Tooele Property (collectively with the 449 Acre Water, the "Tooele Water").

69.     In total, Geringer and Management spent $13,352,192 of investor funds for the Tooele Property and Water, despite actual knowledge that annexation into Tooele City was highly unlikely which, upon information and belief, made the project economically infeasible.

70.     As a steward of third-party investor capital, and serving as a professional real estate manager of that capital, Geringer breached his fiduciary duties by carelessly spending over $13 million in investor funds on the Tooele Project without first taking proper steps to resolve known annexation issues, which issues would directly affect lot yield, profits and the economic viability of the project.

71.     Geringer also breached his fiduciary duties by failing to disclose these facts to investors, misrepresenting material information regarding the status of the Tooele project, and failing to disclose material information to investors regarding annexation issues and lot yield.

72.     CAREIC's May 25, 2007 PPM (the "CAREIC May 2007 PPM"), pursuant to which money was raised from investors for the Tooele project, never mentions any of these facts.  Instead, the PPM misrepresents material facts concerning the status of and prospects for annexation as follows:

> In the twelve month period ended December 31, 2006, we incurred $18,608 in entitlement costs in the form of government filing fees, engineering fees and legal fees in connection with planning and approvals, Tooele zoning entitlements, conceptual and master land use plan, noise assessment study, and annexation requests. We are currently attempting to induce Tooele's City council to approve annexation of our properties into the city of Tooele. If this occurs, we will have substantially completed the entitlement process.

73.     The CAREIC May 2007 PPM also misrepresents facts concerning how many homes could be entitled, saying: "We expect to complete entitlements for 900 to 1,000 single-family homes on the properties, including multi-family residences, in the next two years."

74.     At the time this statement was made, Geringer knew, or should have known, that the number of possible units on the property would be much less.

2.      *Irrational and Unsupported Sales Assumptions*

75.     In connection with the Tooele Project, Management created a document entitled "*Tooele Pro Forma Assumptions*" (the "Tooele Pro Forma"), which sets forth Management's financial underwriting related to the Tooele project.

76.     According to the Tooele Pro Forma, Management's determination that investor funds should be spent on the project was based on, among other things, the following assumptions: (a) $9.4 million land purchase price for 347 acres; (b) lot densities of 4 dwelling units per acre, thereby generating 1,388 finished lots; (c) 1.1 million in entitlement expenses; and (d) sales forecasts of 58 finished lots per month commencing in April 2008, with project sellout in March 2010, *thereby suggesting an annual absorption rate of almost 700 finished lots per year*.

77.     However, as early as May 14, 2005 – before the first dollar had been spent – Geringer knew the absorption rate the pro forma was based upon was unrealistically optimistic.

78.     An internal memorandum prepared by CAREIC personnel stated that in 2004, Tooele City had only issued 195 single family building permits for the entire year, and that as of May 2005, Tooele City had only issued permits for 52 single family units.

79.     Put another way, to economically justify the Tooele Project, Management forecasted that: (a) Tooele City's new home demand was going to rise almost four fold (from 195 permits to 700 permits per year); and (b) CAREIC was going to capture 100% of that entire expansion in new home demand.

80.     Geringer had a duty to use proper and accurate assumptions and forecasts in pursuing the Tooele Project.

81.     Geringer breached his fiduciary duties by using irrational sales assumptions that were not backed by any third-party market share or market study data.

82.     Additionally, the sales forecast was dependent upon the Tooele Project being annexed into the City of Tooele, which Geringer knew from the outset was not likely.

83.     Yet, upon information and belief, no adjustments were made to the Tooele Pro Forma, and investors were never informed that CAREIC's forecasts were completely without a rational basis.

84.     Geringer had a fiduciary duty to update project metrics, lot yield and sales forecasts as the project progressed, and to disclose such information to investors prior to sinking investor money into a project doomed to fail.  By not doing so, Geringer breached his fiduciary duties of care, loyalty, and disclosure.

> 3.     *Encumbering the Tooele Property with $3.72 million in Debt Related to CAK*

85.     On March 27, 2006, CAREIC obtained a $5,380,295 loan from ANB Financial, which loan was secured by the 264 Acres (the "ANB Loan").

86.     However, the proceeds of the ANB Loan were not used for acquisition or development of the Tooele Property.  Instead, $1.5 million was used to pay off a prior loan

(which had been used to purchase property in Kingman), and the remaining $3.7 million was used to purchase additional property relating to the Kingman Project.

87.     Geringer had a fiduciary duty not to encumber, or not to allow the encumbrance of, the Tooele Project with millions of dollars of debt that did not benefit the project in any way.  At the very least, Geringer had a fiduciary duty to update the Tooele Pro Forma relating to the Tooele property with the additional burdensome debt, and to disclose the new metrics and projections to investors.  By not doing so, Geringer breached his fiduciary duty.

### *(c)     Smyrna Property*

88.     Geringer breached his fiduciary duties with respect to the real estate project in Smyrna, Tennessee by, among other things: (a) ignoring known land and development issues and proceeding with land purchases and development despite insurmountable obstacles, and failing to disclose such issues to investors; (b) using false and improper data to analyze the project's feasibility and profitability; (c) using false and fraudulent estimates for lot demand, and providing false information to investors; (d) proceeding with lot purchases and development despite insufficient funds and resources; and (e) engaging in self-dealing.

### *1.     Ignoring Pre-purchase Due Diligence*

89.     In September and October of 2006, Geringer assigned to CAREIC two contracts in which he had entered to purchase a total of 643 acres of real property outside of Smyrna, Tennessee (the "Smyrna Property").  The contracts required the purchaser to pay, at closing, approximately $7.4 million just to acquire the property.

a.     *Management's Knowledge of Insurmountable Obstacles to Development*

90.     Upon information and belief, no later than September 2006, Geringer began investigating whether the Smyrna Property was viable for real estate development.

91.     No later than December 2006, Geringer received a report from Ragan-Smith Engineers ("RSE").  Geringer had commissioned the report to investigate various issues with the Smyrna Property (the "RSE Report").

92.     The RSE Report put Geringer on notice that much of the Smyrna Property was undevelopable because of its geographic features, including the following:

a.  the land was "moderately steep" with maximum slopes ranging from 15% to 25% and comprising 36.7 acres of the total;

b.  there were two prominent streams on the property, and approximately 22.4 acres were within the FEMA recognized flood plain;

c.  an additional 14.7 acres was required for stream buffers; and

d.  an additional 120.79 acres were required for roads and detention ponds.

93.     Of the 643 acres CARIEC had under contract, only 316.5 were developable, and as a result, *the maximum number of lots theoretically possible on the entire property was no more than 1,295*.

94.     The RSE Report also put Geringer on notice of serious problems and expense with obtaining water and sanitary sewer services to the Smyrna Property, including:

a.  The property had no sewer services at the time.  If a Septic Tank Effluent Pump system was used to address this problem, it would consume an additional 129.5 acres, further reducing *the maximum possible number of lots to 919*;

b.  An alternative gravity sewer system would not be built by the Town of Smyrna for 5 to 10 years.  Constructing a portion of that system (excluding on site collection) would cost CAREIC at least $2,725,000 in 2006 dollars;

     c.   A new water storage reservoir and booster pump would be required to meet domestic and fire flow demands, at a cost of an additional $1,500,000 to CAREIC in 2006 dollars.

95.      Finally, the RSE Report put Geringer on notice that to achieve minimum lot sizes (and maximum density), the Smyrna Property would have to be annexed to the Town of Smyrna.  Since there were several parcels of land between the City limits and the Smyrna Property, annexation was unlikely for at least 4-5 years.

96.      In February 2007, Geringer received the results of a *Sinkhole Review* he had commissioned with regard to the Smyrna Property.

97.      The Sinkhole Review put Geringer on notice of other problems with the Smyrna Property, including:

     a.   Several exposed joints and sinkholes were identified which, the Review concluded, "are not likely to support structural elements due to the need to accept water during storm events";

     b.   Several karst features (caves) were found on the Smyrna Property.  The area covered by these features "would not feasibly support structural elements," and would require protection from trespassers;

     c.   The majority of the 147 acre parcel had essentially no onsite soil that would be acceptable for use as engineered fill.  As a result, utility placement and landscaping would be difficult, and an off-site borrow source would be necessary to develop the property.

98.      The RSE Report had previously noted that finding suitable off-site soils of a magnitude to complete development was questionable.

99.      The issues raised in the Sinkhole Review further directly affected the residential lot yield for the Smyrna Property, and in turn the revenues and profits that could be generated from sales of lots from the project.

100.    By written report dated August 7, 2007, RSE advised Geringer that the proposed off-site sewer extension needed for the Smyrna Property would cost $7.5 million, plus $775,700 in engineering fees, for a total sewer cost of $8.3 million.

101.    On August 13, 2007, RSE provided Geringer with a Phase One Environmental Report (the "Phase One Report"), which put Geringer on notice that the Smyrna Property had significant numbers of sink holes and karst features, and that a wetland delineation report needed to be conducted to assure compliance with regulatory wetland requirements.

b.    *Geringer Analysis Ignores Known Facts*

102.    On or about December 8, 2006, Geringer performed his first complete internal analysis of the development of the Smyrna Property (the "December 2006 Analysis").

103.    The December 2006 Analysis states that it "conservatively estimates" that the project would generate sales proceeds of approximately $64.8 million, with $43.5 million in acquisition and development costs, yielding a profit of $24.9 million. However, this conclusion assumed that:

a.    annexation, rezoning, lot development, and off-site development work would require about 18-24 months (not the 4 to 5 years that RSE had advised);

b.    lot sales would begin in the second year of the project (*i.e.,* 3 years before annexation was achieved);

c.    the project would generate at least 1600 lots for sale (not the 919 that RSE had advised were possible).

104.    The assumptions contained in Geringer's December 2006 Analysis are directly contradicted by facts known to Geringer at the time. In violation of his fiduciary duty of care, Geringer completely disregarded material information concerning the economic viability of the

Smyrna Property for development that Geringer knew about at the time, in performing his analysis, and in closing the purchase of the Smyrna Property.

105.    Geringer revised his analysis of the Smyrna Property at least twice (in February 2007 and June 2007) before closing the purchase of the property on August 15, 2007.

106.    In each of these revised analyses, Geringer made further assumptions that were contradicted by facts he knew at the time.

107.    For instance, in the February 12, 2007 Revision, Geringer assumed that off-site work would require only 12–18 months (rather than the 18–24 months stated in the December 2006 Analysis), and assumed that the Property would yield 2,000 lots for sale (rather than the 1,600 stated in the December 2006 Analysis).

108.    Both of these assumptions were directly contradicted by facts known to Geringer at the time.  In violation of his fiduciary duty of care, Geringer completely disregarded material information concerning the economic viability of the Smyrna Property for development that he knew about at the time, in generating the February 2007 Revision, and in proceeding to close the purchase of the Smyrna Property.

109.    Similarly, on June 5, 2007, Geringer generated a further revision to the December 2006 Analysis (the "June 2007 Revision").  The June 2007 Revision assumed that:

   a.   off-site sewer costs for the project would be no more than $5 million, and that CAREIC would receive $3 million in Smyrna Town sewer credits;

   b.   CAREIC would deliver and sell 250 finished lots between September 2008 and September 2009; and

   c.   CAREIC would thereafter deliver and sell 50 finished lots per quarter until 2017.

110.    Each of these assumptions was unrealistic, or was contradicted by facts known to Geringer at the time.

111.    For instance, no later than August 7, 2007, Geringer knew that: (a) mandatory off-site sewer improvements would cost $8.3 million, as compared to the $5 million assumed in the June 2007 Revision, and represented to investors; (b) the Town of Smyrna had not agreed to any binding sewer reimbursement credits; (c) on-site environmental conditions were present on the Smyrna Property, which could materially impact developable acreage and substantially increase development costs; and (d) on-site streams and wetlands needed further analysis to determine lot yield and project feasibility.

112.    Notwithstanding all these facts, on August 15, 2007, Geringer closed the purchase of the Smyrna Property, rather than conducting further investigation to assure the viability of the Smyrna Project.

113.    In so doing, Geringer breached his fiduciary duty of care in relation to the Smyrna Property.  Upon receiving information about the Smyrna Project, a prudent manager would have inquired further into these conditions to determine the likely impact on developable acreage, development cost increases, and potential no-build zones for on-site environmental conditions that could not be feasibly remediated.  Instead of doing this, Geringer purchased the Smyrna Property without conducting additional and basic due diligence, and continued to raise money from investors while misrepresenting, or failing to disclose, material facts relating to the project.

114.    As a result, Geringer spent some $7.9 million of investor funds to acquire real estate that the Debtors had no realistic prospect of successfully developing.

## 2. *False and Fraudulent Estimates of Demand for Lots*

115.    A material part of Geringer's case for the acquisition, development, and further investment in the Smyrna Project was his assertion that major production builders were committed to make substantial purchases of production lots in the Smyrna Project.

116.    For instance, Geringer's files contain three letters purportedly from Beazer Homes dated December 21, 2006, July 12, 2007, and July 30, 2008.  Each of these letters states that Beazer Homes is prepared to purchase 126 production lots each year.

117.    On information and belief, none of these letters is genuine.

118.    On information and belief, none of the letters represented an actual authorized expression of interest from Beazer, but each was instead the result of a conspiracy between Geringer and a former officer of Beazer Homes who had been business associates prior to the Smyrna Project.

119.    Each of these letters reiterates exactly the same purchase commitment despite drastic deterioration changes in the condition of the housing market between December 2006 and July 2008.

120.    In addition, these alleged commitments to new purchases of production lots are directly contradicted by Beazer Homes' own statements in press releases and other public documents dated no later than November 2006, which stated that Beazer was not making commitments for new land acquisition.

## 3. *Proceeding Despite Insufficient Capital and Resources*

121.    By August 2007, the purchase price for the real estate involved in the Smyrna Project was approximately $7.9 million.  In addition, by August of 2007, Geringer knew that,

before he could begin to develop the property, CAREIC would have to spend an additional $8.3 million to construct an off-site sewer improvement.

122.     At that time, however, CAREIC had been able to raise only $4.1 million for the Smyrna Project through CAS's Series A Private Placement Memorandum, so that additional funds had to be borrowed from third parties to close the purchase of the real estate.

123.     In fact, CAREIC was able to fund only $1.3 million of the $7.9 million purchase price for the real estate.  For the rest of the purchase price, CAREIC borrowed approximately $1.8 million from a hard-money lender on unfavorable terms (12% interest, 6 month maturity, 20% default rate) (the "Hard Money Loan"), and an additional $1.8 million from Geringer and another member of Management on the same terms (the "Insider Loans").

124.     The Hard Money Loan and the Insider Loans were both secured by Trust Deeds on the Smyrna Property.

125.     With these encumbrances on the Smyrna Property, there was insufficient collateral value to support financing of the $8.3 million off-site sewer improvement that was required before CAREIC could develop and sell lots from the Smyrna Project.

126.     Faced with these facts, a prudent real estate development professional would have abandoned the project as economically infeasible, and would have returned to investors the money raised for the project.

127.     Instead, in breach of his fiduciary duty of care, Geringer proceeded to close on the Smyrna Project and expended some $7.9 million of investor funds on the project that never had a chance of being successfully developed.

*4.     Self-dealing*

128.    Geringer also breached his fiduciary duty of loyalty to CAREIC by acquiring rights to the Smyrna Project in his individual name, and upon information and belief, assigned those rights to CAREIC in exchange for a fee of $150,000.00.

## 2.     Lack of Board Oversight.

129.    Geringer breached his fiduciary duty by failing to devote sufficient time and attention to the Debtors, failing to properly inform himself of the activities of the Debtors and Management, and failing to implement or enforce clear and appropriate duties and responsibilities for CAREIC's Management.

130.    Geringer also breached his fiduciary duties by failing to properly oversee the activities of CAREIC, and by failing to exercise ordinary care in reviewing and assuring the accuracy of offering materials used to solicit investments in the Debtors, PPMs, and materials filed with the SEC.

131.    As a result, among other things: (a) Management co-mingled money amongst the Debtors and misused investor funds as one big "piggy bank"; (b) Management solicited investments in CAREIC and the other Debtors by means of offering documents that omitted material information; (c) the Debtors' securities were illegally sold by unlicensed finders and brokers; (d) the Debtors' securities were sold to unaccredited investors; (e) the Debtors' core business activities were not appropriately pursued; and (f) executives were allowed to waste corporate assets on activities that did not benefit the Debtors without check or repercussion.

132.    In short, Geringer failed at his basic duties to inform himself of the actions of the Debtors and Management.

### 3. Lack of Officer Diligence.

133.    Geringer had a fiduciary duty to devote sufficient time and attention to the Debtors to allow him to sufficiently perform his tasks as President and a Director with due care, skill, and diligence.  Geringer did not do this.

134.    For instance, by attempting to manage all of the Legacy Debtors' large real estate projects, Geringer was unable to devote enough diligence and care to any of these projects, causing them to fail.

135.    This is especially true since, at the time Geringer was attempting to develop all of the large real estate projects at the same time, Geringer maintained an active law practice in California and pursued numerous other business ventures.

136.    As a result of Geringer's failure to devote sufficient attention to the Debtors, the Debtors breached a variety of securities laws in connection with their capital raising activities, the Debtors operated in a way that was highly imprudent and did not protect investor capital, and the Debtors' real estate activities were not competently pursued.

### 4. Lack of Internal Control and Reporting Procedures

137.    In May of 2008, CAREIC's auditors informed Management that CAREIC's system of internal financial controls was deficient and suffered from several "reportable conditions," as that term is defined under the standards of the American Institute of Certified Public Accountants.

138.    CAREIC's auditors notified Management that, among other things, Management:

    a.   allowed inaccurate and inconsistent subscription agreements and offering documents;

b.   allowed individuals to subscribe to and purchase investments offered as private placements to accredited investors, even though they had answered the Company's investor suitability questionnaire to indicate that they were not accredited;

c.   did not have adequate policies and procedures related to significant functions, including back office, accounting, personnel, payroll, and executive functions;

d.   allowed one officer to hold ultimate control over multiple critical functions;

e.   allowed Geringer to negotiate contract terms related to property acquisitions and financing arrangements, independently and outside of CAREIC, with the result that neither CAREIC nor any of its executives had any input on the terms, structure or purchase price;

f.   allowed expense reports without receipts or other adequate documentation to assure that the claimed expenses were actually incurred; and

g.   did not require pre-approval at the management level of significant expense reimbursement requests, including expense requests from non-employees.

139.   Geringer, as President and a director of CAREIC, breached his fiduciary duties by allowing these conditions to occur, and by failing to take remedial actions after becoming aware of these conditions.

### 5.   Reckless Spending of Investor Funds.

140.   The Bankruptcy Court concluded that approximately 25% of all investor funds solicited by the Legacy Debtors were used for executive compensation and fundraising expenses.[22]

141.   This amount of compensation and fundraising expenses was clearly excessive in light of the Debtors' complete lack of operating revenue, and Geringer and Management's complete lack of success in achieving the Debtors' core business plans.

---

[22] Exh. 1 (Consolidation Findings and Conclusions ¶ 42).

142.     Geringer breached his fiduciary duty by receiving and allowing these excessive amounts of compensation, without an adequate or sufficient basis.

(a)     *Executive Compensation.*

143.     Even though the Debtors never generated substantial revenue from operations, let alone profits, Geringer and Management paid themselves salaries that would only have been appropriate in highly profitable corporation.

144.     For example, despite Geringer's abject failure in developing any real estate project or providing any real value to the Debtors, Geringer and CAREIC's other Officers were paid between $15,000 and $25,000 per month in salary.

145.     Additionally, the Debtors inappropriately "reimbursed" Geringer and other Management for so-called office expenses that were excessive, and included costs that were not related to CAREIC's business or operations.

146.     CAREIC also inappropriately paid a number of people, including persons affiliated with Geringer and Management, who either provided no services to CAREIC, or who should not otherwise have been involved in the Company.

147.     CAREIC also paid salaries to sales employees who had ceased producing for CAREIC, and who were in fact devoting their time to other ventures that were not directly related to CAREIC.

(b)     *Inappropriate and Wasteful Retreats*

148.     Although the Debtors had no operating revenue, Management caused the Debtors to pay for "retreats" to destinations like Maui, Hawaii, Palm Springs, California, and Sun Valley, Idaho, for themselves and other employees of the Debtors.

31

149.    These retreats, and the amounts spent on them, were inappropriate and excessive in light of the Debtors' financial condition and business operations.  These retreats were, in essence, free personal vacations for Management at the Debtors' expense.

150.    Geringer breached his fiduciary duties to the Debtors and investors by wasting, or allowing the waste of, the Debtors' resources (investor money) on exuberant compensation and perks, lavish retreats, and personal endeavors.

### 6.    Operating CAOP I

151.    CAREIC operated and managed CAOP I, and as a result, Geringer had fiduciary obligations to CAOP I.

152.    Geringer breached his fiduciary duties in operating and managing CAOP I by, among other things, using CAOP I funds, or allowing CAOP I funds to be used, to pay debts of the Legacy Debtors and Management, in contradiction to disclosures made to CAOP I investors.

153.    For instance, and as set forth above, CAREIC obtained a multi-million dollar loan from ANB Financial.  Though virtually all the proceeds from the ANB Loan were used for the Kingman Project, the loan was secured by certain parcels of the Tooele project, and by the personal guaranties of Geringer and other members of Management.

154.    The ANB Loan went into default, and Management negotiated a settlement with the successor loan holder, pursuant to which the debt was settled for about $3 million.

155.    Management caused CAOP I to pay the settlement amount directly to the new loan holder and effectively "loan" $2.9 million to CAREIC for the ANB Loan, which also released Geringer and other members of Management from their personal guaranties.

156.    No loan documents or notes were executed to document this "loan" from CAOP I to CAREIC until months later, and CAOP I investors were not informed that their money – which was supposed to be used for investing in distressed properties – had been used to pay obligations of CAREIC and certain of its Management, including Geringer.

157.    As a result, Geringer breached his fiduciary duties of care, loyalty and disclosure in operating CAOP I.

**7.    Involvement of Banned Persons in Sales of CAREIC Securities**

158.    Since at least 2003, a person named Robert Clawson ("Clawson") has been subject to a "statutory disqualification" within the meaning of 15 U.S.C. §78c(a)(39), and has been permanently barred from associating with any broker or dealer, or functioning as "a promoter, finder, consultant, agent, or other person who engages in activities with a broker, dealer, or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock."

159.    Geringer knew, or should have known, that Clawson was subject to this statutory disqualification.

160.    Despite this knowledge, Geringer allowed CAREIC to employ Clawson: (a) to be a de facto member of CAREIC's Board; (b) to be intimately involved with the Debtors' securities and offering materials; (c) to solicit investments from investors in the Debtors' securities; and (d) to be involved in many other facets of the Debtors' operations and money-raising scheme.

161.    Geringer breached his fiduciary duty by involving Clawson, or allowing Clawson to be involved in, the Debtors' operations, including the sales of securities, and by concealing that information from the Debtors' investors.

### 8.    Illegal Sales of the Debtors' Securities By Unlicensed Broker Dealers

162.    Geringer also breached his fiduciary duty by allowing the Debtors' securities to be sold illegally through unlicensed finders and broker-dealers.

### (a)    *Unlicensed Sales Employees.*

163.    The CAREIC Officer with principal responsibility for supervising and effecting the Debtors' sales of their securities was Jeff Austin ("Austin").  Austin had no other significant responsibilities with the Debtors, and performed no other substantial duties for the Debtors prior to November of 2010.

164.    Despite Austin's role as head of the Debtors' securities sales, Austin was never licensed with the SEC or any state securities regulator as a broker or dealer.

165.    Similarly, CAREIC's Regional Vice President for Business Development (Eastern Region) was William Grundy ("Grundy").  In this position, Grundy regularly and actively solicited investors, routinely advised investors on the merits of investing in the Debtors, and regularly effected transactions in securities for the Debtors, for which he received compensation, including but not limited to bonuses and incentive rewards.

166.    Grundy did not obtain his Series 62 securities license until February 1, 2008, and did not obtain his Series 63 securities license until June 30, 2008.

167.    CAREIC hired Keith Green ("Green") to be CAREIC's Regional Vice President for Business Development (Western Region).  In this position, Green regularly and actively

solicited investors, routinely advised investors on the merits of investing in the Debtors, and regularly effected transactions in securities for the Debtors, for which he received compensation, including but not limited to bonuses and incentive rewards.

168.    Although Green took the Series 62 or 63 license examinations, he did not pass. As a result, Green has never been licensed as a securities broker-dealer.

169.    Geringer knew, or should have known, that Austin, Grundy and Green were unlicensed, that their principal duties and responsibilities were the sales of the Debtors' securities, and that they were paid compensation for these sales.  Despite this knowledge, Geringer allowed Austin, Grundy, and Green to illegally sell the Debtors' securities.

### (b)    Sales By Other Non-Licensed Persons

170.    In addition to sales by unlicensed employees, Geringer allowed significant sales of the Debtors' securities through unlicensed finders.

171.    Unlicensed finders regularly and actively solicited investors to purchase the Debtors' securities, routinely advised investors on the merits of investing in the Debtors, and regularly effected transactions in securities for the Debtors, for which they received transaction-based compensation.

172.    Geringer knew, or should have known, that CAREIC's securities were being sold by unlicensed finders, for which they received transaction-based compensation.

173.    Despite this knowledge, and in breach of his fiduciary duty, Geringer did not take effective action to stop these illegal sales.

**C.     Material Misrepresentations and Omissions In Securities Offerings and Documents Filed with the SEC**

**1.     The Company's Securities Offerings**

174.    In May 2004—one month after it was organized—the Debtors began raising money from investors.  Over the course of CAREIC's existence, the Debtors raised approximately $70 million through a series of so-called "private placements" pursuant to materially false or misleading PPMs.  Geringer reviewed and commented on the Debtors' misleading PPMs.

*(a)     CARIEC Securities*

175.    CAREIC offered and sold investors approximately $38.4 million in securities of CAREIC.  CAREIC offered and sold the securities in Series A, B, C, D and E.

176.    The PPMs for each of these offerings contained material misrepresentations and omissions.  However, this Complaint focuses on and asserts claims solely relating to CAREIC's $7.1 million Series E offering, which began no earlier than June 1, 2008.

*(b)     Securities of Special Purpose Entities*

177.    In addition to offering and selling securities in CAREIC, Management also offered and sold to the public the securities of several purportedly "single-purpose" or "project-specific" entities.

178.    The offering materials for each of these special purpose entities also contained numerous material misrepresentations and omissions.  However, this Complaint focuses on and asserts claims solely relating to the following offerings and offering documents:

a.  CAS PPM, dated June 25, 2007, pursuant to which $4.1 million was raised; and

b.  CASDF PPM, dated February 1, 2008, pursuant to which $8.4 million was raised.

36

### 2.    Material Omissions Common to All Relevant Securities Offerings

179.    CAREIC's $7.1 million Series E offering, the CAS PPM, and the CASDF PPM (collectively, the "Relevant Securities Offerings"), failed to disclose at least the following adverse material facts:

### (a)    Management's Lack of Success or Experience.

180.    None of the Relevant Securities Offerings disclosed that:

   a.  Over the course of its existence, CAREIC had – with the exception of one small parcel in Star Valley, Wyoming – failed to successfully develop, entitle, or sell a single piece of real estate, let alone "thousands of acres."

   b.  CAREIC had no track record of real estate development, much less a record of success.

   c.  No member of Management, other than Geringer, had any real estate entitlement or development experience prior to joining Castle Arch.

### (b)    Management's Breaches of Fiduciary Duty

181.    The Relevant Securities Offerings also failed to disclose that Geringer and Management had breached and were breaching their fiduciary duties by pursuing real estate projects that were (as described more fully above) known to be infeasible, based on irrational and unsupported assumptions, and based on false and fraudulent estimates of demand.

182.    The Relevant Securities Offerings failed to disclose that the CAREIC Board was failing to properly oversee the activities of CAREIC, failing to exercise ordinary care in reviewing and assuring the accuracy of offering materials used to solicit investments in the Debtors, PPMs, and materials filed with the SEC, all as more fully described above.

183.    The Relevant Securities Offerings failed to disclose that: (a) Geringer operated unchecked by the Board to pursue infeasible and risky development projects; and (b)

Management failed to properly segregate and account for the funds of the Debtors resulting in co-mingling and misuse of investor funds.

184.    The Relevant Securities Offerings failed to disclose that Management was not devoting sufficient attention to the Debtors, and that Management was otherwise breaching their fiduciary duties, all as set forth in greater detail above.

### (c)    Involvement of a Statutorily Banned Person in Debtors' Business and Securities

185.    The Relevant Securities Offerings failed to disclose that Clawson, CAREIC's Managing Director of Business Development, and a de facto officer and member of CAREIC's Board (a) had been permanently banned by the SEC from dealing in securities such as those sold by the Debtors; (b) was intimately involved with the Debtors' securities and PPMs, including the drafting thereof; and (c) was soliciting investments in the Debtors.

186.    At the time of the Relevant Securities Offerings, all of these material adverse facts were known to, or recklessly disregarded by, Geringer.

### 3.    CAS PPM

187.    Among others, the CAS PPM made the following misrepresentations or omissions of material facts:

### (a)    Use of Investment Proceeds

188.    The CAS PPM represented to investors that investments in CAS would be used to fund and support the business operations of the Smyrna Project.  In particular, the CAS Series A PPM states:

> [CAS] was organized . . . as a residential and commercial land development company to develop approximately 1,700 residential lots on approximately 640 acres of land located in the Greater Nashville area of middle Tennessee.

\* \* \* \*

Our principal activity is exploitation of the acquisition rights to approximately 640 acres of property in the Smyrna Tennessee area, obtaining zoning and other entitlements for the property, securing financing for the purchase of the property, improving the property's infrastructure and amenities, and selling the property.

\* \* \* \*

*We intend to use the net sale proceeds of this offering for land acquisition.*

189.    The CAS PPM failed to disclose that Management had previously used funds raised for similar single-purpose entities indiscriminately to fund whatever entity was in need of cash at the time, rather than to advance the business operations of the subject entity.

190.    The CAS PPM failed to disclose that funds invested in CAS would in fact be used for purposes unrelated to CAS's business operations, as need might arise.

191.    In fact, Geringer and Management used proceeds from the CAS PPM to close on the purchase of the Tooele Water, a purpose unrelated to the business operations of CAS, without disclosing this information to investors.

### (b)    *Infeasibility of the Smyrna Project*

192.    The CAS PPM represents that Geringer's and Management's "conservative sales targets are estimated to be approximately $88.2 million with an estimated $50.3 million in acquisition, development, and selling costs."

193.    The CAS PPM fails to disclose that Geringer's and Management's "conservative" sales targets were based on the assumption that the property would yield 1,700 saleable lots, despite the fact that CAREIC's engineers had advised Geringer that no more than 1,295 were theoretically possible on the property.

194.    At the time the CAS PPM was published, all of these adverse material facts were known to, or recklessly disregarded by, Geringer.

### 4.     CASDF PPM

195.    The CASDF PPM made, among others, the following misrepresentations or omissions of material facts:

#### (a)     Omission of Involvement of Clawson in Offering Materials.

196.     The CASDF PPM does not disclose that CASDF was designed by Clawson, or that Clawson drafted and oversaw the drafting of the CASDF PPM.

#### (b)     Omissions Regarding CAREIC's Inability to Backstop Losses.

197.    The CASDF PPM represents that as CASDF's Manager, CAREIC "_intends to back the Fund's investment and allocate its assets to cover Fund losses, if any_."

198.    However, the CASDF PPM fails to disclose that CAREIC's own financial condition was so precarious at the time of the CASDF offering, that CAREIC did not have any practical ability to backstop CASDF losses.

199.    The CASDF PPM failed to disclose that in early 2008, CAREIC's financial statements reflected that CAREIC had only $3.2 million in current assets, as compared to $8.7 million in current liabilities.

#### (c)     Misrepresentations and Omissions Concerning Properties.

200.    The CASDF PPM fails to disclose that the Kingman Project was infeasible and based on irrational forecasts.

201.    The CASDF PPM fails to disclose that the Debtors had insufficient funding and resources to tackle a project as large as Kingman.

202.    The CASDF PPM falsely represents that the Smyrna property is in "the final stages of the entitlement process."

203.    In fact, at the time of the CASDF PPM, the Smyrna Property had not been annexed into the Town of Smyrna; no zoning applications had been approved to increase lot yield; no sewer or water services were available, and such services required several million dollars to complete; and no substantial entitlement work had been completed.

204.    The CASDF PPM describes the Tooele Property as one of the projects to which CASDF might allocate funds "secured with senior lien positions using the land as collateral."

205.    However, the CASDF PPM fails to disclose that: (a) the Tooele Property was already encumbered with a $5.3 million ANB Loan, which was secured by the 264 Acres of Tooele Property; (b) virtually all of the ANB Loan proceeds were used on issues relating to the Kingman Project, as opposed to improving Tooele; and (c) as a result, funds allocated to the Tooele Property could not be secured with a senior lien.

206.    At the time the CASDF PPM was published, all of these adverse material facts were known to, or recklessly disregarded by, Geringer.

**5.    CAREIC Series E PPM.**

207.    The CAREIC Series E PPM made, among others, the following misrepresentations or omissions of material facts:

*(a)    Omissions Concerning Lack of Internal Controls and Reliability of Financial Statements.*

208.    In May 2008, CAREIC's auditors formally informed CAREIC that its system of internal financial controls was deficient and suffered from several "reportable conditions," as that term is defined by the standards of the American Institute of Certified Public Accountants.

209.    CAREIC's auditors notified Management that, among other things, Management:

    a.   allowed inaccurate and inconsistent subscription agreements and offering documents;

    b.   allowed individuals to subscribe to and purchase investments offered as private placements to accredited investors, even though they had answered the Company's investor suitability questionnaire to indicate that they were not accredited;

    c.   did not have adequate policies and procedures related to significant functions, including back office, accounting, personnel, payroll, and executive functions;

    d.   allowed one officer to hold ultimate control over multiple critical functions;

    e.   allowed Geringer to negotiate contract terms related to property acquisitions and financing arrangements, independently and outside of CAREIC, with the result that neither CAREIC nor any of its executives had any input on the terms, structure or purchase price;

    f.   allowed expense reports without receipts or other adequate documentation to assure that the claimed expenses were actually incurred; and

    g.   did not require pre-approval at the management level of significant expense reimbursement requests, including expense requests from non-employees.

210.   The CAREIC Series E PPM failed to disclose that CAREIC's auditors believed that CAREIC's system of internal financial controls was deficient and suffered from several "reportable conditions."

211.   Nor did CAREIC otherwise disclose this material adverse fact.  To the contrary, in its next two quarterly reports on Form 10-Q, CAREIC reported that it had evaluated the effectiveness and design of its system of internal control and had concluded that the system was effective "as of the end of the period covered by [each] report."

### (b)   *Misrepresentations and Omissions Concerning Properties.*

212.   The CAREIC Series E PPM represents that since its inception, CAREIC has "purchased or [has] purchase rights to land parcels located in California, Arizona, Tennessee, Texas, Wyoming and Utah."

213.    The PPM fails to state, however, that at the time of the Series E PPM, Geringer and CAREIC had lost all of CAREIC's properties and purchase rights to the land parcels in California and Texas as a result of poor management, breaches of fiduciary duty, and/or lack of funds and resources.

214.    With respect to the Smyrna Project, the CAREIC Series E PPM states: "We have three letters of commitment from major production builders in the area to move forward in purchasing the finished lots from Castle Arch."

215.    Upon information and belief, this statement is false.  CAREIC did not have letters of commitment from separate home builders to purchase finished lots, and the letters it purportedly had from Beazer Homes were, on information and belief, not genuine.

216.    The CAREIC Series E PPM falsely represents that the Smyrna property is in "the final stages of the entitlement process."

217.    In fact, at the time of the CAREIC Series E PPM, the Smyrna property had not been annexed into the Town of Smyrna; no zoning applications had been approved to increase lot yield; no sewer or water services were available, and such services required several million dollars to complete; and no substantial entitlement work had been completed.

218.    The CAREIC Series E PPM fails to disclose that the Tooele Property was already encumbered with a $5.3 million ANB Loan, which was secured by the 264 Acres of Tooele Property, and that virtually all of the ANB Loan proceeds were used on issues relating to the Kingman Project, as opposed to improving Tooele.

219.    At the time the CAREIC Series E PPM was published, all of these adverse material facts were known to, or recklessly disregarded by, Geringer.

**D.      Fraudulent Transfers**

220.     Prior to the Petition Date, the Debtors made significant transfers of funds to the Defendants.

221.     Attached hereto as **<u>Exhibit 2</u>** is a summary prepared from the Debtors' books and records in the Trustee's custody and control of transfers of cash made by the Debtors noted thereon to Defendants prior to the Petition Date (collectively, these transfers are referred herein as the "<u>Transfers</u>").

222.     Upon information and belief, the noted Debtors made the Transfers to Defendants as compensation, including salary, consulting fees, expenses, and bonuses.

223.     Each of the Transfers is a transfer of an interest of the named Debtors in property.

224.     Upon information and belief, the Transfers were made by the Debtors, or the obligations of the Debtors to make the Transfers to Defendants, were made with actual intent to hinder, delay or defraud the Debtors' creditors and investors.

225.     Upon information and belief, the Transfers were made by the Debtors, or the obligations of the Debtors to make the Transfers to Defendants, were for services for which the Debtors received less than a reasonably equivalent value in exchange for such Transfers or obligations.

226.     Each of the Defendants is an insider of the Debtors.

227.     At all relevant times, the Debtors were insolvent.

228.     At all applicable times, the relevant Debtors had at least one unsecured creditor.

E.     **The Geringer Proof of Claim**

229.    Geringer filed a Proof of Claim in CAREIC's Bankruptcy Case, originally
asserting a general unsecured claim in the amount of $8,550,891.72 (the "Geringer Claim").
The Trustee objected to the Geringer Claim, and the Bankruptcy Court conducted an
evidentiary trial on the Claim.  By Memorandum Decision,[23] the Bankruptcy Court disallowed
the Geringer Claim in its entirety, other than for the general unsecured amount of $243,146.00.

## VI.     CLAIMS AGAINST DEFENDANTS

### FIRST CLAIM FOR RELIEF
*(Breach of Fiduciary Duty)—Geringer*

230.    The Trustee incorporates each of the preceding allegations by reference.

231.    As President and a Director of CAREIC, Geringer owed fiduciary duties of
care, loyalty and disclosure to CAREIC, the Debtors, and their shareholders, which required
him to: (a) exercise sound business judgment, in good faith, with the care that an ordinarily
prudent person in a like position would exercise under similar circumstances, and in a manner
reasonably believed to be in the best interests of CAREIC and the Debtors; (b) use his
ingenuity, influence, and energy, and to employ all the resources of the Debtors, to preserve
and enhance the property and earning power of the Debtors, even if the interests of the Debtors
are in conflict with his own personal interests, as well as to disclose all conflicts of interest that
might affect his duties and responsibilities to CAREIC, the Debtors, and their shareholders;
and (c) fully and accurately disclose all material facts to investors relating to the Debtors, their
operations, management and real estate projects, as well as any other material fact that may
influence an investor's decision to invest in the Debtors.

---

[23] Bankruptcy Case Docket 665.

232.   As set forth in Part V.B.1.(a), Geringer breached his fiduciary duties of care, loyalty and disclosure relating to the Kingman Project by, among other things: (a) using irrational sales assumptions and pro forma metrics that contradicted known data, and failing to disclose to investors accurate forecasts; (b) wasting corporate assets (investor money) on an infeasible project without sufficient funding and resources; and (c) engaging in co-mingled and self-dealing transactions that were not disclosed to investors.

233.   As set forth  in Part V.B.1.(b), Geringer breached his fiduciary duties of care, loyalty and disclosure relating to the Tooele Property and project by, among other things: (a) failing to disclose known annexation issues to investors; (b) wasting corporate assets (investor money) to purchase land and water rights despite actual knowledge of annexation limitations that made the project infeasible; (c) using irrational sales assumptions and pro forma metrics that contradicted known data, and failing to disclose to investors accurate forecasts; and (d) encumbering, or allowing the encumbrance of, the project with millions of dollars of debt that solely benefitted a different project and entity, and failing to disclose the unrelated project debt to investors.

234.   As set forth in Part V.B.1.(c), Geringer breached his fiduciary duties of care and disclosure relating to the Smyrna Property and project by, among other things: (a) ignoring known land and development issues and proceeding with land purchases and development despite insurmountable obstacles, and failing to disclose such issues to investors; (b) using false and improper data to analyze the project's feasibility and profitability; (c) using false and fraudulent estimates for lot demand, and providing false information to investors; (d)

proceeding with lot purchases and development despite insufficient funds and resources; and

(e) engaging in self-dealing transactions.

235.    As stated in Part V.B.2. and V.B.3., Geringer breached his fiduciary duties of

care by, among other things: (a) failing to devote sufficient time and attention to the Debtors;

(b) failing to properly inform himself of the activities of the Debtors and Management; (c)

failing to implement or enforce clear and appropriate duties and responsibilities for

Management, or to set clear limits on executive authority; and (d) failing to exercise ordinary

care in reviewing and assuring the accuracy of offering materials used to solicit investments in

the Debtors, PPMs, and materials filed with the SEC.

236.    Geringer breached his fiduciary duties of care, loyalty, and disclosure by

causing, or allowing the "reportable conditions" in the Bouwhuis Letter to occur, and failing to

disclose and remedy such conditions thereafter, as set forth in Part V.B.4.

237.    As set forth in Part V.B.5., Geringer breached his fiduciary duties of care and

loyalty by causing, or allowing the Debtors to: (a) pay Management salaries and perks in

excess of industry norms, without an adequate or sufficient basis, especially since the Debtors

achieved no profits, and Management did not provide the Debtors with commensurate time and

value for the payments; (b) pay persons as employees of the Debtors, even though such persons

were hired to assist Management in their personal endeavors; and (c) waste money (investor

funds) on lavish retreats for Management and others, even though the Debtors did not have

sufficient funds to pay for the retreats.

238.    As set forth in Part V.B.6., Geringer breached his fiduciary duties of care,

loyalty and disclosure relating to CAOP I by, among other things, using or allowing CAOP I

funds to pay debts of the Legacy Debtors and Management, in contradiction to disclosures made to CAOP I investors.

239.    Geringer breached his fiduciary duties of care and disclosure by allowing Clawson to be heavily involved in the Debtors' operations and the origination and sales of the Debtors' securities, as set forth in Part V.B.7.

240.    Geringer breached his fiduciary duties of care and disclosure by causing, or allowing the bulk of the Debtors' securities to be illegally sold to the public, including to unaccredited investors, by unlicensed broker-dealers using materially misleading information, as set forth in Part V.B.8.

241.    Geringer's above conduct constitutes gross negligence, and violates his fiduciary duties.

242.    The Trustee is entitled to an award of damages in an amount to be proven at trial.  The Trustee is further entitled to attorneys' fees, costs, and interest to the extent allowed by law.

243.    Because Geringer's conduct was sufficiently willful and malicious, the Trustee is further entitled to an award of punitive damages.

### SECOND CLAIM FOR RELIEF
*(Violation of Utah, Nevada and California Securities Law—Utah Code Ann. § 61-1-22, NRS § 90.660 and California Corporations Code § 25504)—Geringer*

244.    The Trustee incorporates each of the preceding allegations by reference.

245.    With respect to investors who purchased the Debtors' securities pursuant to the Relevant Securities Offerings, Geringer had a duty to fully and accurately disclose, or to ensure

the disclosure of, all material facts that a reasonable investor would deem important in making the decision to invest in the Debtors' securities.

246.    Geringer did not fulfill his duty, but instead made, disseminated, approved, and/or allowed false statements or omissions of material fact in connection with investors' purchases of the Debtors' securities pursuant to the Relevant Securities Offerings.

247.    Each of the Relevant Securities Offerings failed to disclose, among other things, the following adverse material facts: (a) Management's lack of experience and success in real estate entitlement and development, as set forth in Part V.C.2.(a); (b) Management's breaches of fiduciary duty, as set forth in Part V.C.2.(b); and (c) Clawson's involvement with the Debtors and their securities, as set forth in Part V.C.2.(c) (collectively, the "Relevant Securities Offerings Material Omissions").

248.    The CAS Series A PPM made material misrepresentations and omissions concerning, among other things: (a) use of investment funds, as set forth in Part V.C.3.(a); and (b) the infeasibility of the Smyrna project, as set forth in Part V.C.3.(b) (collectively, the "CAS Series A Material Misrepresentations and Omissions").

249.    The CASDF PPM made material misrepresentations and omissions concerning, among other things: (a) omissions of Clawson's involvement in the offering materials, as set forth in Part V.C.4.(a); (b) omissions of CAREIC's inability to backstop losses, as set forth in Part V.C.4.(b); and (c) misrepresentations and omissions concerning the Debtors' properties and projects, as set forth in Part V.C.4.(c) (collectively, the "CASDF Material Misrepresentations and Omissions").

250.     The CAREIC Series E PPM made material misrepresentations and omissions concerning, among other things: (a) omissions of lack of internal controls and reliability of financial statements, as set forth in Part V.C.5.(a); and (b) misrepresentations and omissions concerning the Debtors' properties and projects, as set forth in Part V.C.5.(b) (collectively, the "CAREIC Series E Material Misrepresentations and Omissions").

251.     Geringer is a control person of the Debtors, as set forth in the applicable statutes and, therefore, is jointly and severally liable for the damages sustained by the Debtors' investors in purchasing the securities in the three above-mentioned offerings.

252.     Geringer and Management: (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in an act, practice, or course of business that operated as a fraud or deceit upon the Debtors' investors in the above offerings.

253.     Geringer acted with scienter, either with an actual intent to defraud or in reckless disregard of the truth or falsity of the statements in the above offerings.

254.     The Debtors' investors reasonably relied upon the accuracy of the representations in making their decisions to invest, and would not have made the investments at the price paid, if at all, had they known the truth of the material misrepresentations and omissions in the above offerings.

255.     As the result of the material misrepresentations and omissions in the above offerings, the investors in such offerings have been damaged.

256.     Accordingly, the Trustee is entitled to an award of damages on behalf of the investors of the relevant offerings in an amount to be proven at trial.  The Trustee is also entitled to attorneys' fees, costs, and interests to the extent allowed by the applicable statutes.

257.     Because Geringer's conduct was sufficiently willful and malicious, the Trustee is further entitled to an award of punitive damages.

### THIRD CLAIM FOR RELIEF
*(Securities Fraud Under Section 10(b) of the Securities Act of 1934 (15 U.S.C. § 78j) and Rule 10b-5 (17 CFR 240.10b-5))—Geringer*

258.     The Trustee incorporates each of the preceding allegations by reference.

259.     With respect to investors who purchased the Debtors' securities pursuant to the Relevant Securities Offerings, Geringer had a duty to fully and accurately disclose, or ensure the disclosure of, all material facts that a reasonable investor would deem important in deciding whether to buy the Debtors' securities.

260.     Geringer made, or permitted to be made, material misrepresentations, and omitted to make material statements in connection with investors' purchases of securities pursuant to the Relevant Securities Offerings.  Such material misrepresentations and omissions include:

   a.   the Relevant Securities Offerings Material Omissions;

   b.   the CAS Series A Material Misrepresentations and Omissions;

   c.   the CASDF Material Misrepresentations and Omissions; and

   d.   the CAREIC Series E Material Misrepresentations and Omissions.

261.     Geringer, as a control person of the Debtors, is responsible for the above material misrepresentations and omissions, which are attributed to him.

262.    With respect to the above material misrepresentations and omissions, Geringer and Management: (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in an act, practice, or course of business that operated as a fraud or deceit upon investors in such offerings.

263.    Geringer acted with scienter, either with an actual intent to defraud or in reckless disregard of the truth or falsity of the above material misrepresentations and omissions.

264.    The investors in the relevant offerings reasonably relied upon the accuracy of the representations in making their decisions to invest, and would not have made the investments at the price paid, if at all, had they known the truth of the material misrepresentations and omissions.

265.    As the result of the material misrepresentations and omission of material facts, the investors in the above offerings have been damaged.

266.    Accordingly, the Trustee is entitled to an award of damages in an amount to be proven at trial.  The Trustee is also entitled to attorneys' fees, costs, and interests to the extent allowed by law.

267.    Because Geringer's conduct was sufficiently willful and malicious, the Trustee is further entitled to an award of punitive damages.

**FOURTH CLAIM FOR RELIEF**
*(Control Person Liability Under Section 20(a) of the Exchange Act of 1934 (15 U.S.C. § 78t(a))
–Geringer*

268.    The Trustee incorporates each of the preceding allegations by reference.

269.    As set forth above, Geringer and Management violated Section 10(b) of the Securities Act of 1934 (15 U.S.C. § 78j) and Rule 10b-5 (17 CFR 240.10b-5), or permitted persons over whom they had control to violate those provisions.

270.    At all material times, Geringer acted as a controlling person within the meaning of Section 20(a) of the Exchange Act.

271.    By virtue of his executive positions with each of the Debtors, Geringer had possession, direct or indirect, of the power to direct or cause the direction of the management and policies of CAREIC and the Debtors.

272.    Specifically, Geringer served as CAREIC's President and was a member of CAREIC's Board of Directors from its inception in 2004 until he resigned in July 2009. Geringer was also responsible for all the Debtors' real estate projects and had "general charge of the business, affairs, and property of the Company and general supervision over its officers, employees, and agents."

273.    Accordingly, the Trustee is entitled to an award of damages in an amount to be proven at trial.  The Trustee is also entitled to attorneys' fees, costs, and interests to the extent allowed by law.

274.    Because Geringer's conduct was sufficiently willful and malicious, the Trustee is further entitled to an award of punitive damages.

## FIFTH CLAIM FOR RELIEF
*(Common Law Fraud)—Geringer*

275.    The Trustee incorporates each of the preceding allegations by reference.

277.    With respect to investors who purchased the Debtors' securities pursuant to the Relevant Securities Offerings, Geringer made, disseminated, approved and/or allowed false statements or omissions of material fact in connection with the investors' purchase of the Debtors' securities.

290.    As a control person of the Debtors, such material misrepresentations and omissions are attributed to Geringer.

296.    Such material misrepresentations and omissions include:

a.   the Relevant Securities Offerings Material Omissions;

b.   the CAS Series A Material Misrepresentations and Omissions;

c.   the CASDF Material Misrepresentations and Omissions; and

d.   the CAREIC Series E Material Misrepresentations and Omissions.

297.    At the time Geringer made or allowed these misrepresentations, Geringer knew that the statements were false, or at a minimum, made or allowed the statements recklessly and without regard for the truth.

298.    Geringer intended that the Debtors' investors would rely upon the statements, and made or allowed the misrepresentations with the intent of inducing the investors to purchase the Debtors' securities and invest funds.

299.    The investors in the relevant offerings reasonably relied upon the statement and have made substantial payments to the Debtors as a result of the misrepresentations.

300.    The investors suffered damages as a result of the misrepresentations.

301.    Accordingly, the Trustee is entitled to an award of damages in an amount to be proven at trial.  The Trustee is also entitled to attorneys' fees, costs, and interests to the extent allowed by law.

302.    Because Geringer's conduct was sufficiently willful and malicious, the Trustee is further entitled to an award of punitive damages.

**SIXTH CLAIM FOR RELIEF**
*(Negligent Misrepresentation)—Geringer*

303.    The Trustee incorporates each of the preceding allegations by reference.

304.    With respect to investors who purchased the Debtors' securities pursuant to the Relevant Securities Offerings, Geringer made, disseminated, approved and/or allowed false statements or omissions of material fact in connection with the investors' purchase of the Debtors' securities.

317.    As a control person of the Debtors, such material misrepresentations are attributed to Geringer.

323.    Such false statements include:

  a.  the Relevant Securities Offerings Material Omissions;

  b.  the CAS Series A Material Misrepresentations and Omissions;

  c.  the CASDF Material Misrepresentations and Omissions; and

  d.  the CAREIC Series E Material Misrepresentations and Omissions.

324.    At the time the material representations were made, the statements were untrue.

325.    Geringer failed to use reasonable care in making or allowing these representations, and was in a better position than the investors to know the true facts.

326.    Geringer intended that the investors would rely upon the statements, and made or allowed the representations with the intent of inducing the investors to purchase the Debtors' securities and invest funds.

327.    The relevant investors reasonably relied upon the statements and invested substantial sums of money in the Debtors as a result of the misrepresentations.

328.    The investors suffered damages as a result of the misrepresentations.

329.    Accordingly, the Trustee is entitled to an award of damages in an amount to be proven at trial.  The Trustee is also entitled to attorneys' fees, costs, and interests to the extent allowed by law.

330.    Because Geringer's conduct was sufficiently willful and malicious, the Trustee is further entitled to an award of punitive damages.

## SEVENTH CLAIM FOR RELIEF
*(Civil Conspiracy)—Geringer*

331.    The Trustee incorporates each of the preceding allegations by reference.

332.    With respect to investors who purchased the Debtors' securities pursuant to the Relevant Securities Offerings, Geringer and Management constitute a combination of two or more persons, who acted together to defraud investors.

333.    Geringer and Management agreed to a course of action to cover up the true nature of their scheme to defraud.

334.    As an overt act in furtherance of the conspiracy, Geringer and Management intentionally misrepresented the true state of the Debtors' business affairs to investors, or allowed such misrepresentations to occur.

335.     Such false statements include:

    a.   the Relevant Securities Offerings Material Omissions;

    b.   the CAS Series A Material Misrepresentations and Omissions;

    c.   the CASDF Material Misrepresentations and Omissions; and

    d.   the CAREIC Series E Material Misrepresentations and Omissions.

337.     The Trustee is entitled to an award of damages in an amount to be proven at trial.  The Trustee is also entitled to attorneys' fees, costs, and interest to the extent allowed.

338.     Because Geringer's conduct was sufficiently willful and malicious, the Trustee is further entitled to an award of punitive damages.

### EIGHTH CLAIM FOR RELIEF
*(Violation of State RICO Laws—Utah Code Ann. § 76-10-1605(1)–(2) and NRS § 207.470)—Geringer*

339.     The Trustee incorporates each of the preceding allegations by reference.

340.     With respect to investors who purchased the Debtors' securities pursuant to the Relevant Securities Offerings, Geringer and Management engaged in a repeated pattern of unlawful activity by fraudulently and illegally selling, or allowing the sale of, securities to investors through unlicensed brokers and by means of material misrepresentations and omissions.

341.     Under the veil of a legitimate business, Geringer used or allowed the Debtors to defraud investors and engage in broader misconduct.

342.     Geringer's common purpose in engaging in or allowing such repeated and fraudulent conduct was to induce investors to place monies into the Debtor enterprise so that he could profit from the scheme.

343.    Specifically, Geringer and Management engaged in a scheme or artifice to defraud money from investors by means of false or fraudulent pretenses, representations, and promises, including but not limited to:

    a.    the Relevant Securities Offerings Material Omissions;

    b.    the CAS Series A Material Misrepresentations and Omissions;

    c.    the CASDF Material Misrepresentations and Omissions; and

    d.    the CAREIC Series E Material Misrepresentations and Omissions.

344.    Geringer also sold, or allowed the Debtors' securities to be illegally sold to investors through unlicensed broker-dealers.

345.    The acts of fraud and racketeering activity identified herein constitute a "pattern of racketeering activity" because the acts alleged were related to each other by virtue of a common purpose and common result of fraudulently and illegally soliciting investments in the Debtor enterprise from investors, or allowing such activity to occur.

346.    Geringer committed or caused to be committed a series of overt acts in furtherance of the Debtor enterprise and the conspiracy to affect the objects thereof, including but not limited to defrauding, and causing or allowing the Debtors' securities to be illegally sold by unlicensed broker-dealers to investors.

347.    As the result of Geringer's acts, investors have been damaged.

348.    Accordingly, the Trustee is entitled to an award of damages in an amount to be proven at trial, including treble damages as allowed by the applicable statutes.

<u>**NINTH CLAIM FOR RELIEF**</u>
*(Avoidance of Fraudulent Transfers Under 11 U.S.C. § 544(b) and*
*Utah Code Annotated §§ 25-6-5(1)(a) and 25-6-8)—All Defendants*

349.    The Trustee incorporates each of the preceding allegations by reference.

350.    At all times hereto, the relevant Debtors had at least one unsecured creditor.

351.    Each of the Transfers was a transfer of an interest of the Debtors in property.

352.    The Transfers to each Defendant as set forth on **Exhibit 2** were made or were based on obligations incurred with actual intent to hinder, delay or defraud the relevant Debtors' creditors.

353.    Each of the Transfers and/or obligations is avoidable by the Trustee under 11 U.S.C. § 544(b) and Utah Code Ann. §§ 25-6-5(1)(a) and 25-6-8.

### TENTH CLAIM FOR RELIEF
*(Avoidance of Fraudulent Transfers Under 11 U.S.C. § 544(b) and*
*Utah Code Annotated §§ 25-6-5(1)(b) and 25-6-8)—All Defendants*

354.    The Trustee incorporates each of the preceding allegations by reference.

355.    At all times hereto, the relevant Debtors had at least one unsecured creditor.

356.    Each of the Transfers was a transfer of an interest of the Debtors in property.

357.    The relevant Debtors did not receive reasonably equivalent value in exchange for each of the Transfers to each Defendant as set forth on **Exhibit 2**, or any obligation of the Debtors to make the Transfers.

358.    At the time the Transfers were made or the obligations were incurred, the relevant Debtors: (a) were engaged or were about to engage in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that they would incur debts beyond their ability to pay as they became due.

359.    Each of the Transfers and/or obligations is avoidable by the Trustee under 11 U.S.C. § 544(b) and Utah Code Ann. §§ 25-6-5(1)(b) and 25-6-8.

### ELEVENTH CLAIM FOR RELIEF
*(Avoidance of Fraudulent Transfers Under 11 U.S.C. §544(b) and*
*Utah Code Ann. §§ 25-6-6(1) and 25-6-8)—All Defendants*

360.    The Trustee incorporates each of the preceding allegations by reference.

361.    At all times hereto, the relevant Debtors had at least one unsecured creditor.

362.    Each of the Transfers was a transfer of an interest of the Debtors in property.

363.    The relevant Debtors did not receive reasonably equivalent value in exchange for each of the Transfers to each Defendant as set forth on **Exhibit 2**, or any obligation of the Debtors to make the Transfers.

364.    The relevant Debtors were insolvent at the time the Transfers or any obligations to make the Transfers were made, or became insolvent as a result of the Transfers.

365.    Each of the Transfers and/or obligations is avoidable by the Trustee under 11 U.S.C. § 544(b) and Utah Code Ann. §§ 25-6-6(1) and 25-6-8.

### TWELFTH CLAIM FOR RELIEF
*(Recovery of Avoided Transfers Under 11 U.S.C. §§ 550 and 551)—All Defendants*

366.    The Trustee incorporates each of the preceding allegations by reference.

367.    Each of the Transfers is avoidable under 11 U.S.C. § 544(b) and Utah Code Ann. §§ 25-6-5, 25-6-6, and 25-6-8.

368.    The Trustee may recover from each of the Defendants and preserve for the benefit of the respective Trusts each of the Transfers as relating to each of the Defendants under 11 U.S.C. §§ 550 and 551.

### THIRTEENTH CLAIM FOR RELIEF
*(Disallowance of Claims—11 U.S.C. § 502)—All Defendants*

369.    The Trustee incorporates each of the preceding allegations by reference.

370.    To the extent any of the Defendants assert a claim against the Debtors, such claims, to the extent not asserted, cannot be asserted and are barred under applicable law, the Confirmed Plan and Confirmation Order.

371.    Each of the Transfers made to each of the Defendants are avoidable by the Trustee under 11 U.S.C. § 544.

372.    The Geringer Claim, and any other claim that may be asserted by the other Defendants and determined to be an allowed claim, must be disallowed under 11 U.S.C. § 502(d), unless the applicable Defendants have paid the amount for which they are liable for the avoidable Transfers made to them.

**FOURTEENTH CLAIM FOR RELIEF**
*(Subordination – 11 U.S.C. § 510(c))—All Defendants*

373.    The Trustee incorporates each of the preceding allegations by reference.

374.    As set forth in all of the facts stated herein, the Defendants have engaged in wrongful behavior and acted in bad faith in relation to the Debtors.

375.    The Defendants' actions have harmed the Debtors' creditors and investors, all of whom are beneficiaries under the Trusts.

376.    The Geringer Claim, or any other claim that may be asserted by Defendants and determined to be allowed claims, must be subordinated pursuant to 11 U.S.C. § 510(c) and all applicable principles of equitable subordination incorporated by that section to all beneficiaries of the Trusts.

**FIFTEENTH CLAIM FOR RELIEF**
*(Constructive Trust)—All Defendants*

377.    The Trustee incorporates each of the preceding allegations by reference.

378.    Each of the Transfers to Defendants was comprised of property of the Debtors and was made by the respective Debtors improperly or was based on illegal or fraudulent obligations or actions.

379.    Each of the Transfers can be traced to the wrongful behavior of the Debtors, through Geringer and Management.

380.    Allowing Defendants to retain any of the Transfers would unjustly enrich the Defendants and would be inequitable.

381.    An injustice would result if the Defendants were allowed to keep their respective Transfers.

382.    A constructive trust for the benefit of the respective Trusts must be imposed in the amount of the Transfers made to each of the Defendants.

### SIXTEENTH CLAIM FOR RELIEF
*(Unjust Enrichment and Disgorgement)—All Defendants*

383.    The Trustee incorporates each of the preceding allegations by reference.

384.    Each of the Transfers to the Defendants were comprised of property of the Debtors.

385.    The Transfers to each of the Defendants conferred a benefit upon the relevant Defendant.

386.    Upon information and belief, each Defendant knowingly benefited from the Transfers made.

387.    Allowing Defendants to retain the Transfers made to each of them would unjustly enrich the Defendants and would be inequitable.

388.     Absent return of the Transfers, the Trusts will be damaged by Defendants' unjust enrichment and may have no adequate remedy at law.

389.     Defendants must disgorge the total amount of the Transfers applicable to them for the benefit of the respective Trusts.

## VII.     **PRAYER FOR RELIEF**

WHEREFORE, the Trustee respectfully prays for relief as follows:

A.     On the First Claim for Relief, an award of actual and punitive damages in an amount to be proven at trial.

B.     On the Second Claim for Relief, an award of actual and punitive damages in an amount to be proven at trial, plus interest as set forth in the applicable statutes.

C.     On the Third Claim for Relief, an award of actual and punitive damages in an amount to be proven at trial.

D.     On the Fourth Claim for Relief, an award of actual and punitive damages in an amount to be proven at trial.

E.     On the Fifth Claim for Relief, an award of actual and punitive damages in an amount to be proven at trial.

F.     On the Sixth Claim for Relief, an award of actual and punitive damages in an amount to be proven at trial.

G.     On the Seventh Claim for Relief, an award of actual and treble damages in an amount to be proven at trial.

H.     On the Eighth Claim for Relief, an award of actual and treble damages in an amount to be proven at trial.

I.       On the Ninth Claim for Relief, avoidance of the Transfers.

J.       On the Tenth Claim for Relief, avoidance of the Transfers.

K.      On the Eleventh Claim for Relief, avoidance of the Transfers.

L.       On the Twelfth Claim for Relief, recovery of the avoided Transfers.

M.     On the Thirteenth Claim for Relief, disallowance of the Geringer Claim and any other Claims asserted by the Defendants.

N.     On the Fourteenth Claim for Relief, subordination of the Geringer Claim and any other Claim of the Defendants that has been or may be determined to be an allowed Claim.

O.     On the Fifteenth Claim for Relief, the imposition of a constructive trust on the Transfers made to Defendants.

P.      On the Sixteenth Claim for Relief, a judgment for unjust enrichment and a judgment ordering the disgorgement of the Transfers.

Q.     For pre-judgment interest, attorneys' fees, and costs of suit to the extent allowed by applicable federal or state law.

R.      For any other relief as the Court deems appropriate.

## VIII.  JURY DEMAND

Plaintiff requests a jury for all issues and causes of action that are triable by a jury.

DATED this 24th day of November, 2015.

**DORSEY & WHITNEY LLP**

  */s/ Milo Steven Marsden*
Milo Steven Marsden
Peggy Hunt
Nathan S. Seim
*Attorneys for D. Ray Strong, Liquidating Trustee*