IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| D. RAY STRONG, as Liquidating Trustee of the Consolidated Legacy Debtors Liquidating Trust and the Castle Arch Opportunity Partners I, LLC Liquidating Trust,<br><br>  Plaintiff,<br><br>  vs.<br><br>ROBERT D. GERINGER, ROBERT D. GERINGER, P.C., and FINE ARTS ENTERTAINMENT,<br><br>  Defendants. | MEMORANDUM DECISION & ORDER<br><br><br><br>Case No. 2:15-CV-00837-TC |

   Plaintiff D. Ray Strong brings this case in his dual role as the representative of the post-bankruptcy estate of multiple debtors and as the liquidating trustee for trusts.  Representing the debtors as well as their creditors and investors, Mr. Strong now seeks an order compelling arbitration[1] of his claims against Defendants Robert D. Geringer; Robert D. Geringer, P.C.; and Fine Arts Entertainment (collectively, "Mr. Geringer" or Defendants).

---

[1]See Mot. Compel Arb'n, ECF No. 42.

Mr. Strong represents the interests of several entities who were debtors in a bankruptcy action, including the primary debtor Castle Arch Real Estate Investment Company, LLC (CAREIC).  Specifically, the debtors are Castle Arch Real Estate Investment Company, LLC (CAREIC); CAOP Managers, LLC; Castle Arch Kingman, LLC; Castle Arch Smyrna, LLC (CAS); Castle Arch Secured Development Fund, LLC (CASDF); Castle Arch Star Valley, LLC; Castle Arch Opportunity Partners I, LLC; and Castle Arch Opportunity Partners II, LLC (collectively, "the Debtors").

Mr. Strong also represents a series of trusts in his post-bankruptcy role as the liquidating trustee: (1) Consolidated Legacy Debtors Liquidating Trust; (2) Castle Arch Opportunity Partners I, LLC Liquidating Trust; and (3) Castle Arch Opportunity Partners II, LLC Liquidating Trust (collectively, "the Trusts").

Although Mr. Strong initiated this lawsuit, he now asks the court to stay proceedings and compel the parties to arbitrate all of the claims.  Mr. Geringer opposes the motion.

The court grants the motion in part and denies the motion in part for the reasons discussed below.

# BACKGROUND

Mr. Strong pleads sixteen causes of action:  breach of fiduciary duty;
violation of Utah, Nevada and California securities laws;  securities fraud under
Section 10(b) of the Securities Act of 1934;  control person liability under Section
20(a) of the Exchange Act of 1934;  common-law fraud;  negligent
misrepresentation;  civil conspiracy;  violation of Utah and Nevada RICO laws;
avoidance of fraudulent transfers under federal and state law[2] (Claim Nos. 9−11);
recovery of avoided transfers under 11 U.S.C. §§ 550, 551;  disallowance of claims
under 11 U.S.C. § 502;  subordination under 11 U.S.C. § 510(c);  constructive
trust; and unjust enrichment and disgorgement.  He asks the court to compel
arbitration of all sixteen claims.

Those claims can be grouped into three categories based on whose interests
Mr. Strong represents: first, the claim for breach of fiduciary duty (Claim No. 1),
for which Mr. Strong represents CAREIC and the Debtors; second, the fraud and
RICO claims (Claim Nos. 2–8) for which Mr. Strong represents the investors'

---

[2]11 U.S.C. § 544(b) (2012); Utah Code Ann. §§ 25-6-5(1)(a),  25-6-5(1)(b),
25-6-6(1), 25-6-8 (LexisNexis 2013).

interests; and third, the bankruptcy claims (Claims Nos. 9–16) for which Mr.
Strong represents the creditors' interests.

The primary Debtor, CAREIC, a limited liability company, was formed in
2004 and began operations in 2005.[3]  In 2007, the members of CAREIC entered
into an Amended Operating Agreement between and among themselves.  (Strong
Decl. Ex. 1, ECF No. 43-1 [hereinafter Am. Operating Agreement].)   Mr.
Geringer acted as CAREIC's president until July 2009.  In 2011, CAREIC filed for
Chapter 11 bankruptcy, and the other Debtors did the same.  The bankruptcy court
consolidated the petitions for all but one of the Debtors.

In February 2012, Mr. Geringer filed a proof-of-claim in CAREIC's
bankruptcy proceeding seeking a little over $8.5 million for unpaid compensation,
reimbursement for expenses, and reimbursement for guaranties of loan obligations.
Mr. Strong opposed Mr. Geringer's claims.  The bankruptcy court held a two-day
trial in February 2013.  Mr. Strong told the court he wished to reserve a right to
later bring additional claims and defenses, to which Mr. Geringer objected.
Mr. Strong decided not to delay the proof-of-claim litigation, and the trial

---

[3] The company was formed to buy land with investor money, develop the
land, then sell the property for profit.

continued.  In the end, the bankruptcy court granted Mr. Geringer an unsecured

claim against CAREIC's bankruptcy estate for only $243,146.

Also in February 2013, Mr. Strong filed his Second Amended Chapter 11

Trustee's Plan of Liquidation.  Later that June, the bankruptcy court confirmed that

plan.  Meanwhile, Mr. Strong told Mr. Geringer that he was considering pursuing

certain claims—some of which make up this lawsuit—against him in court.

During the first five months of 2015, Mr. Strong and Mr. Geringer participated in a

mediation trying to resolve those claims out of court.  In May, they signed a

Memorandum of Understanding.  (Geringer Decl. Ex. K, ECF No. 49.)

While Mr. Strong and Mr. Geringer were mediating, Mr. Strong sued other

officers and directors of CAREIC (but not Mr. Geringer).  (See Strong v. Cochran,

Civ. No. 2:14-CV-00788-TC-EJF (D. Utah).)  That case is often referred to as the

"Insider[4] Case."  Although the Insider Case was filed more than a year before this

case was brought,[5] some of the causes of action asserted in that case overlap with

_____

[4] The Bankruptcy Act says a director, officer, or person in control of a
debtor is an "insider."  11 U.S.C. § 101(31)(B).

[5] In addition to this and the Insider Case, Mr. Geringer filed a lawsuit on
November 6, 2015, in the U.S. District Court for the Central District of California
seeking a declaration that his defenses precluded Mr. Strong's potential claims.

claims asserted in this case (for example, the claim for breach of fiduciary duty). There were three groups of investors for whom Mr. Strong was pursuing claims in the Insider Case—the CAREIC Series E investors, the CAS investors, and the CASDF investors.

The Insider Case Defendants moved for an order to stay and force arbitration.  Mr. Strong opposed that motion.  Despite Mr. Strong's objection, this court compelled arbitration of two of the claims and granted discovery to determine whether other claims should be treated similarly.[6]

Eventually, after the Insider Case parties conducted the limited discovery ordered by the court, Mr. Strong changed his mind about arbitration.  The court-ordered discovery revealed documentation of agreements to arbitrate.  That documentation included "subscription agreements" that incorporated CAREIC's Amended Operating Agreement, including the arbitration clause.  The Series E investors, for the most part, signed those subscription agreements, but the other two groups of investors (the CAS and CASDF investors) did not.  When the

---

That suit has since been transferred to this District.  See Geringer v. Strong, Civ. No. 2:16-CV-00391-TC.

[6]See Order at 10, Strong v. Cochran, Civ. No. 2:14-CV-00788-TC-EJF (D. Utah May 5, 2015), ECF No. 44 in that case.

defendants in the Insider Case filed their second motion to compel arbitration
(focusing on the remainder of the claims), Mr. Strong no longer objected and the
court stayed the case so the parties could arbitrate the entire dispute.[7]

Mr. Strong now wants the claims in this action sent to arbitration.

## DISCUSSION

Under the Federal Arbitration Act, a party may move to stay litigation and
compel arbitration when the parties previously agreed to arbitrate.  9 U.S.C. §§ 3,
4; Utah Code Ann. § 78B-11-108 (LexisNexis 2012).  When a party seeks to
enforce a contract's arbitration clause, "questions of arbitrability must be addressed
with a healthy regard for the federal policy favoring arbitration."  Moses H. Cone
Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).  Indeed, "any
doubts concerning the scope of arbitrable issues should be resolved in favor of
arbitration, whether the problem at hand is the construction of the contract
language itself or an allegation of waiver, delay, or a like defense to arbitrability."
Id. at 24–25.  Although courts presume arbitration is proper, "this presumption
disappears when the parties dispute the existence of a valid arbitration agreement,"

---

[7]See Order, Strong v. Cochran, Civ. No. 2:14-CV-00788-TC-EJF (D. Utah
Aug. 20, 2015), ECF No. 55 in that case.

Dumais v. Am. Golf Corp., 299 F.3d 1216, 1219–20 (10th Cir. 2002).

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986).

When deciding if a dispute falls within an arbitration agreement, a court must first "determine whether the arbitration provision is broad or narrow." Newmont U.S.A. Ltd. v. Ins. Co. of N. Am., 615 F.3d 1268, 1274 (10th Cir. 2010) (citing Cummings v. FedEx Ground Package Sys., Inc., 404 F.3d 1258, 1261 (10th Cir. 2005)).  If the provision is broad, the court is to presume the dispute—or "even a collateral matter"—will be arbitrable.  Id. (quoting Cummings, 404 F.3d at 1261).

Here, the arbitration provision is broad.  Mr. Geringer agreed to arbitrate certain disputes in CAREIC's Amended Operating Agreement.  The clause reads: "Any dispute or other disagreement arising from or out of this Amended Operating Agreement or the performance of any officer, director or agent on behalf of the company shall be submitted to arbitration . . . ."  (Am. Operating Agreement art. 15.16.)  When arbitration clauses use language like "arises out of," the provision is considered broad.  Newmont, 615 F.3d at 1274–75.  Accordingly, the court

presumes that disputes that arise out of the contract between the parties are arbitrable.

Mr. Strong argues that all his claims arise out of the CAREIC agreement because all of the alleged activity involved Mr. Geringer's performance as an officer or agent of the company. In response, Mr. Geringer makes two main arguments: first, Mr. Strong lacks authority to invoke the arbitration agreement; and second, Mr. Strong waived or forfeited any right he might have had because he did not seek, and even opposed, arbitration earlier.

## I.     Authority to invoke the arbitration agreement

Mr. Strong's authority to prosecute claims that will benefit the creditors and investors derives from the Debtors' plan of liquidation and the bankruptcy court's confirmation of that plan. Article 6.4 of the plan reads:

> Persons who vote to accept or reject the Plan may elect to "opt-out" of this unconditional assignment of Individual Claims[8] to the extent that they hold any such

---

[8] The plan defines "Individual Claims" by stating:

> From his investigation to date, the Trustee has determined that there may exist numerous claims, rights and causes of action against the Debtors, insiders of the Debtors and/or Persons who managed the Debtors or

9

Claims.[9]  To do so, such Persons must affirmatively
make this election by marking the appropriate box on
their Ballot opting out of the unconditional assignment.
Persons who opt-out of the unconditional assignment of

_____

raised funds from Investors on the Debtors' behalf,
including types of actions that are defined as "Causes of
Action" under the Plan, that may be held by Persons in
their own right as either creditors of or Investors in the
Debtors, which may not necessarily be property of the
Estates within the meaning of Section 541 of the
Bankruptcy Code (collectively, the "Individual Claims").

(Confirmed Plan art. 6.4.)

[9] A "Claim" means:

a claim against a Person or its property as defined in
Section 101(5) of the Bankruptcy Code, including,
without limitation (i) any right to payment, whether or
not such right is reduced to judgment, and whether or not
such right is liquidated, unliquidated, fixed, contingent,
matured, unmatured, disputed, undisputed, legal,
equitable, secured or unsecured; or (ii) any right to an
equitable remedy for breach of performance, if such
breach gives rise to a right to payment, whether or not
such right to an equitable remedy is reduced to judgment,
or is fixed, contingent, matured, unmatured, disputed,
undisputed, secured or unsecured.

(Confirmed Plan art. 1.1.)

> Individual Claims will receive no distribution from the
> net litigation proceeds obtained by the applicable
> Liquidation Trust with regard to prosecution of the
> Individual Claims.

(Geringer Decl. Ex. B, ECF No. 48-1 [hereinafter Confirmed Plan].)  The

bankruptcy court's subsequent order reads, "[A]ll Individual Claims . . . , with the

exception of any Individual Claims held by Merchants Trust Company, are

unconditionally assigned . . . and such assignments are APPROVED." (Order

Confirming Ch. 11 Trustee's 1st Am. Plan of Liquidation Dated Feb. 25, 2013, In

re Castle Arch Real Estate Inv. Co., (No. 11-35082)  (ECF No. 705).)  This

assignment of claims from the creditors and investors is valid, and Mr. Strong is

authorized to prosecute these claims.  Grede v. Bank of N.Y. Mellon, 598 F.3d

899, 901–03 (7th Cir. 2010); In re Tribune Co., 464 B.R. 126, 193 (Bankr. D. Del.)

("The Plan's claim assignment procedure is voluntary because it allows creditors to

'opt out.'"), on reconsideration, 464 B.R. 208 (Bankr. D. Del. 2011).

    Because a liquidation trustee stands in the shoes of a debtor, as well as its

creditors and investors, he may enforce the rights they have.  Allegaert v. Perot,

548 F.2d 432, 436 (2d Cir. 1977).  The trustee is bound by the arbitration

agreements the debtor formed before it petitioned for bankruptcy protection.  Hays

& Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149, 1153 (3d

Cir. 1989).  Yet for those who did not agree to arbitration, the trustee is not

required to arbitrate claims for their benefit.  Id. at 1153, 1155; In re Oakwood

Homes Corp., No. 02-13396PJW, 2005 WL 670310, at *4 (Bankr. D. Del. Mar. 18,

2005).

 In Allegaert, the court rejected the defendant's attempt to force the trustee to

arbitrate certain claims:

> These are statutory causes of action belonging to the
> trustee, not to the bankrupt, and the trustee asserts them
> for the benefit of the bankrupt's creditors, whose rights
> the trustee enforces.  For example, if there had been no
> federal bankruptcy proceeding and if a creditor had
> independently asserted a claim under N.Y. Debt & Cred.
> Law § 278 to set aside a fraudulent transfer of assets, the
> creditor would not have been subject to any arbitration
> agreement.  Since the trustee stands in the creditor's
> shoes for this purpose, he too should not be compelled to
> arbitrate these claims.

Allegaert, 548 F.2d at 436 (emphasis added) (internal citations omitted).  In

Allegaert, Hays, and Oakwood, the courts held that because the creditors and

investors never agreed to arbitrate their disputes with the defendants, the trustee is

12

not bound.  Mr. Geringer similarly is not required to arbitrate those claims for the same reason that a trustee is not bound.

Mr. Strong cites Nueterra Healthcare Management, LLC v. Parry, 835 F. Supp. 2d 1156 (D. Utah 2011), as an example of a court compelling two entities to arbitrate even though they did not sign an arbitration agreement.  Id. at 1162–64. That case is distinguishable.

In Nueterra, one of those entities was the parent company of a subsidiary who had signed the arbitration agreement.  The court held that when "the relationship between a parent and subsidiary were 'sufficiently close' and the claims 'sufficiently intertwined' with the relevant agreement, the nonsignatory parent would be bound by the arbitration agreement.'"  Id. at 1162 (quoting I-Link Inc. v. Red Cube Int'l AG, No. 2:01-CV-00049-K, 2001 WL 741315, at *5 (D. Utah Feb. 5, 2001)).  The court then analyzed the causes of action that the nonsignatory parent alleged and how its claims relied on the subsidiary's contract and the subsidiary's rights under that contract.  Id. at 1163.  The court then found that the parent company had "manifested an intent to be bound by the [contract], which it now seeks to enforce."  Id.  Because the contract included an arbitration clause, the court compelled the parent company to arbitrate.  Id.

13

The second nonsignatory plaintiff in <u>Nueterra</u> was a sister company to the subsidiary company that signed the contract.  The court held that although there is a presumption of separateness between sister companies, that "may be overcome where the claims 'involve the same misconduct as that alleged against the signatory and arise out of [the] contract containing [the] arbitration provision.'" <u>Id.</u> at 1163.  Again, after reviewing the complaint's causes of action and allegations, the court found that they involved the "same misconduct as that complained of by the signatory, and arise out of the [contract]."  <u>Id.</u> at 1164.  It further noted that the sister companies had "congruent interests with regard to the litigation."  <u>Id.</u>  Because the two sister companies complained of the same misconduct that arose out of the same contract and their interests were congruent, the presumption of separateness was overcome and the nonsignatory sister company was bound by the arbitration agreement.  <u>Id.</u>

Here, the creditor and investor claims, allegations, and interests are not intertwined or congruent with the debtor claims.  Mr. Strong's three categories of claims differ.  For example, the breach-of-fiduciary-duty claim that benefits the Debtors is distinct from the rights and allegations made for the other claims.  The creditors and investors could not claim that Mr. Geringer owed them a fiduciary

14

duty.  Similarly, with the fraud and RICO claims, the Debtors cannot contend that

Mr. Geringer, as an officer and director of the Debtors, defrauded them.  The

creditors' and investors' claims are different from the Debtors' claim.

Furthermore, the creditors' and investors' claims and allegations do not prove that

they intended to agree to the Amended Operating Agreement or the arbitration

clause.

In addition, Mr. Geringer never agreed to arbitrate his disputes with the

creditors and some of the investors.  The arbitration provision in the CAREIC

Amended Operating Agreement memorialized an agreement between the members

of CAREIC.  The first paragraph of the agreement reads, "THIS Amended

Operating Agreement . . . is made and entered into . . . by and among those

Members admitted to the Company . . . ."  (Am. Operating Agreement 1.)  And the

last page of the agreement includes a list of the eight members of the company and

their signatures.  (Id. at 36.)  Mr. Geringer was on that list.  (Id.)  Accordingly, an

agreement existed between Mr. Geringer and CAREIC, and Mr. Strong's breach-

of-fiduciary-duty claim, which is for the benefit of the Debtor, is arbitrable.

Mr. Strong does not contend that any creditor formed a separate agreement

with Mr. Geringer outside of the CAREIC agreement.  Certainly, the language of

15

the arbitration provision is open ended: "Any dispute . . . arising from or out of this [agreement] or the performance of any . . . agent . . . shall be submitted to arbitration . . . ." (Id. art. 15.16.)  Despite the unrestrained language, the provision is not an invitation or offer to any person who has a dispute with CAREIC or its members.  Otherwise, the provision would be a gratuitous offer to any person in the world who would agree to it.

Even if Mr. Geringer intended to offer the right to arbitrate to those outside of the agreement, creditors still cannot take advantage of the provision because under the agreement, "[n]one of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company."  (Id. art 15.14.) Because Mr. Geringer never agreed to arbitrate disputes with creditors, he is not bound to arbitrate the claims that are for their benefit.

The same can be said for some, but not all, investors.  The investors in CAS and CASDF were not asked to enter an arbitration agreement with CAREIC or Mr. Geringer.  Accordingly, the claims based on their rights are not arbitrable.  But the investors in CAREIC Series E were given a subscription agreement that incorporated the Amended Operating Agreement, which included the arbitration provision.  The Series E subscription reads: "The purchase of Investment Units is

16

subject to the terms and conditions set forth . . . in [CAREIC's] Amended Operating Agreement . . . by and among the members of the Company.  The Operating Agreement is incorporated herein by this reference."  (Strong Decl. Exs. 2-1, 2-2, ECF Nos. 43-2, 43-3 [hereinafter Subscription Agreements] (Subscription Agreements attached as Exhibit Cs to the Private Placement Memoranda).)  By incorporating its Amended Operating Agreement, CAREIC invited the Series E investors who received these Subscription Agreements to participate in the arbitration agreement.  Most Series E investors signed and executed it.

While litigating the Insider Case, Mr. Strong discovered the names of at least 134 Series E investors and found signed subscriptions for all but approximately ten of them.  (Decl. of Sarah Goldberg Supp. Reply Mem. 2–3, Ex. 1.)  Despite incomplete evidence that every single Series E investor signed the subscription, there is a sufficient number of signed copies for the court to conclude that an arbitration agreement existed between the Series E investors and Mr. Geringer.  Accordingly, the claims being prosecuted for the benefit of the Series E investors must be arbitrated.

## II.     Waiver of arbitration right

Alternatively, Mr. Geringer maintains that even if Mr. Strong had a right to

request arbitration, he waived or forfeited that right.  The Tenth Circuit gives

courts six factors to weigh when considering whether a party waived its right to

arbitration:

> (1) whether the party's actions are inconsistent with the
> right to arbitrate; (2) whether the litigation machinery has
> been substantially invoked and the parties were well into
> preparation of a lawsuit before the party notified the
> opposing party of an intent to arbitrate; (3) whether a
> party either requested arbitration enforcement close to the
> trial date or delayed for a long period before seeking a
> stay; (4) whether a defendant seeking arbitration filed a
> counterclaim without asking for a stay of the
> proceedings; (5) whether important intervening steps
> [e.g., taking advantage of judicial discovery procedures
> not available in arbitration] had taken place; and
> (6) whether the delay affected, misled, or prejudiced the
> opposing party.

In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig., 790 F.3d

1112, 1116 (10th Cir. 2015) (quoting Peterson v. Shearson/Am. Exp., Inc., 849

F.2d 464, 467 (10th Cir. 1988)), cert. denied sub nom. Cox Commc'ns, Inc. v.

Healy, 136 S. Ct. 801 (2016).  Courts do not mechanically apply these factors.  Id.

(citing <u>Hill v. Ricoh Americas Corp.</u>, 603 F.3d 766, 773 (10th Cir. 2010)). Also, when assessing waiver, "an important consideration . . . is whether the party now seeking arbitration is improperly manipulating the judicial process." <u>Id.</u> (quoting <u>Hill</u>, 603 F.3d at 773) (quotation marks omitted).

Before Mr. Strong requested arbitration, he participated in Mr. Geringer's proof-of-claim litigation in the bankruptcy court, went through mediation multiple times, and attempted to settle his claims against Mr. Geringer. Throughout all that, he did not once ask for arbitration. Indeed, in the Insider Case, Mr. Strong initially opposed a defendant's attempt to compel arbitration. Despite all of that, Mr. Strong is not abusing the judicial process by changing course now. Although Mr. Strong initially opposed arbitration of his claims in the Insider Case, his strategy evolved and understandably changed in response to the court's order and the evidence produced during the Insider Case discovery. The same can be said about his reversal in this case. Since then, he has consistently sought arbitration of all his claims.

The "litigation machinery" has not been invoked here. The dispute between Mr. Strong and Mr. Geringer has a long, complicated history, but the lawsuit currently before the court is still in its early stages. No discovery has occurred. In

19

fact, no Answer or Scheduling Order has been filed.  This case is not an extension of the proof-of-claim litigation in bankruptcy court; it is a separate lawsuit.  And Mr. Geringer's contention that the present causes of action are precluded by principles of res judicata might have merit (the court has no opinion about the merits of this argument at this time), but that is an affirmative defense that must be decided by the adjudicator of the lawsuit.  The participation in a prior lawsuit does not establish Mr. Strong's waiver of any right to arbitrate in this lawsuit.

Similarly, participating in mediation in an attempt to resolve the dispute and entering into a Memorandum of Understanding is actually consistent with Mr. Strong's current demand for arbitration.  Again, whether the Memorandum is binding on Mr. Strong is a question for the ultimate adjudicator.  It is not evidence that Mr. Strong waived any right to arbitrate.  Ultimately, Mr. Strong's request for arbitration at this early stage of this lawsuit does not unfairly prejudice Mr. Geringer.

For the foregoing reasons, the court finds that any right Mr. Strong has to arbitrate has not been waived or forfeited.

### III.   Utah RICO Claim (Claim No. 8)

Mr. Strong's eighth claim alleges violations of the Utah RICO statute.

Subsection (3) of this statute mandates that "[a]ll actions arising under this section

which are grounded in fraud are subject to arbitration under Title 78B, Chapter 11,

Utah Uniform Arbitration Act."  Utah Code Ann. § 76-10-1605(3) (LexisNexis

2012).  Because Mr. Strong repeatedly alleges fraudulent conduct in his RICO

claim, the claim must be arbitrated.

### **ORDER**

For these reasons, the court GRANTS in part and DENIES in part

Mr. Strong's Motion to Compel Arbitration (ECF No. 42).  The court orders that:

1.      All claims are stayed;

2.      The parties must arbitrate the breach-of-fiduciary-duty claim (Claim

No. 1);

3.      The parties must arbitrate the fraud and civil conspiracy claims (Claim

Nos. 2–7) as they relate to the CAREIC Series E investors.  The parties are not

required to arbitrate those claims as they relate to the CAS and CASDF investors;

4.      The parties must arbitrate the Utah RICO claim (Claim No. 8); and

5.      Mr. Strong must file an update on the progress of the arbitration every three months starting on December 1, 2016.

DATED this 15th day of September, 2016.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge